**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LESTER J GARCIA MORALES; SHEYLA MONROY TAY; L. J. I. G. M.; I. G. M.; J. G. M.,

*Petitioners*,

v.

TODD BLANCHE, Attorney General,

*Respondent*.

No. 25-1760

Agency Nos.
A240-533-133
A240-533-134
A240-533-135
A240-533-137
A245-371-133

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 13, 2026
Pasadena, California

Filed August 31, 2026

Before: Richard A. Paez and Patrick J. Bumatay, Circuit Judges, and Mustafa T. Kasubhai, District Judge.*

---

* The Honorable Mustafa T. Kasubhai, United States District Judge for the District of Oregon, sitting by designation.

Opinion by Judge Paez;
Dissent by Judge Bumatay

## SUMMARY[**]


### Immigration

Granting a petition for review filed by Lester Garcia Morales, Sheyla Monroy Tay, and their three minor children of a decision of the Board of Immigration Appeals that denied Garcia Morales's application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), the panel held that (1) the Circumvention of Lawful Pathways Rule ("Rule"), 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 C.F.R. §§ 208.33, 1208.33), is inconsistent with the asylum statute, and therefore, the agency erred by applying the Rule to find Petitioners ineligible for asylum; and (2) the agency erred by failing to apply this court's complete mixed motives framework.

Petitioners, natives and citizens of Guatemala, sought refuge in the United States after the same gang leader who murdered Garcia Morales's sister threatened to kill them. The agency concluded that Garcia Morales was ineligible for asylum under the Rule, which restricts asylum eligibility for non-Mexican asylum seekers who entered the United States between ports of entry between May 11, 2023, and May 11, 2025. Migrants who entered during that time


[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

are subject to the Rule regardless of when their applications are filed and adjudicated.

The panel noted that the district court, in the same litigation that resulted in this court's decisions in *E. Bay Sanctuary Covenant v. Biden* (*East Bay I*), 993 F.3d 640 (9th Cir. 2021), and *E. Bay Sanctuary Covenant v. Garland* (*East Bay II*), had recently vacated the Rule, *E. Bay Sanctuary Covenant v. Trump*, No. 18-CV-06810-JST, 2026 WL 1256873, at *9 (N.D. Cal. May 7, 2026), and the government has filed a notice of appeal.

The panel concluded that 8 U.S.C. § 1252(f), which bars courts (other than the Supreme Court) from enjoining or restraining the operation of specified provisions except in individual cases, did not apply because the asylum statute is not covered by it and because Garcia Morales did not seek relief on a class-wide basis.

The panel reaffirmed *East Bay I*'s holding that restricting asylum eligibility for noncitizens who enter between ports of entry impermissibly conflicts with 8 U.S.C. § 1158(a), which provides that any noncitizen who arrives in the United States—"whether or not at a designated port of arrival"—may apply for asylum.

The panel wrote that the dissent principally reprised the arguments the court rejected in *East Bay I*, including the argument that the Rule does not affect who can apply for asylum, but only who is eligible. The panel reiterated that there is no good or plausible reason to think that Congress mandated a refugee's right to apply for asylum based on their manner of entry and simultaneously permitted the government to deny asylum on that same basis.

Responding to the dissent's argument that the Rule is different from *East Bay I* because it is a rebuttable presumption subject to exceptions—not a categorical ban—the panel concluded that restricting asylum for any subset of noncitizens based on manner of entry is impermissible under § 1158(a). The panel also concluded that each exception is legally invalid or illusory. As to the exception for noncitizens denied asylum or humanitarian protection in a transit country, the panel wrote that, as the court held in *East Bay II*, the government cannot require asylum seekers to be denied protection in a transit country because such a requirement conflicts with the statute's concern for the safety of asylum seekers.

The panel also rejected the remaining counterarguments raised by the government and the dissent, reiterating that the panel is bound by *East Bay I* and *II*. Responding to the dissent's argument that the panel's decision was policy-driven, the panel wrote that it was their dissenting colleague who would ignore precedent in favor of an interpretation unmoored from the law Congress enacted.

Addressing the agency's alternative determination—that Petitioners failed to establish a nexus to a protected ground—the panel remanded for the BIA to apply the court's complete mixed motives framework. A petitioner must establish that membership in his proposed particular social group ("PSG") was or will be at least one central reason for his persecution. Under this court's precedent, a motive is a central reason for harm if (1) that motive, standing alone, would have led the persecutor to harm the applicant, or (2) the persecutor would not have harmed the applicant if such motive did not exist and the motive was more than incidental or tangential. Here, the panel concluded that the BIA committed legal error by conflating the mixed motives

tests. The BIA considered whether Garcia Morales's membership in the assumed PSGs of "taxi business owners," or "Guatemalans who do not comply" with gang extortions, standing alone, would have led the gang leader to harm him, but failed to consider whether the gang leader "would not have harmed" him absent his membership in these PSGs, and whether the motive was more than "incidental" or "tangential."

The panel remanded for further proceedings consistent with this opinion and a concurrently filed memorandum, in which the panel addressed Petitioners' other challenges to the agency's adverse determinations.

Dissenting, Judge Bumatay wrote that the majority's decision usurped immigration policy from the political branches. In 8 U.S.C. § 1158(b)(2)(C), Congress delegated to the Executive broad authority to establish "limitations and conditions" on asylum eligibility as long as they are "consistent" with the asylum statute. Given the text, context, and structure of § 1158(b)(2)(C), Judge Bumatay concluded that the Rule is perfectly consistent with § 1158. The Rule does not interfere with aliens' ability to apply for asylum; it only restricts the parameters of a successful asylum application in limited ways.

Judge Bumatay wrote that the majority judicially creates a substantive "guarantee" for aliens that eliminates the government's ability to consider manner of entry in adjudicating asylum applications. And even more, the Rule does not turn on an alien's "manner of entry." Instead, it applies to all aliens except for those denied asylum elsewhere or those with authorizing paperwork or a pre-scheduled appointment. Most concerning, the majority reads § 1158 so broadly that it all but forecloses the

Executive from promulgating any new conditions on asylum eligibility. Judge Bumatay also concluded that *East Bay I* and *II* do not govern because the Rule does not turn on manner of entry and is not a categorical bar. The Rule includes exceptions and ways for aliens to rebut the presumption.

As to the BIA's mixed motives analysis, Judge Bumatay wrote that the majority creates a new rule that the BIA must use magic words when analyzing mixed motives cases. Under its new rule, the BIA must spell out every element of every way a petitioner may establish mixed motives before denying a claim. In Judge Bumatay's view, the BIA's reasonable decision should be affirmed.

---

## COUNSEL

Zachary D. Aho, Law Office of Zachary D. Aho, Seattle, Washington, for Petitioners.

Matthew B. George (argued), Senior Litigation Counsel; Sheri R. Glaser, Acting Assistant Director, Office of Immigration Litigation; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Morgan Russell (argued), Spencer Amdur, and Cody Wofsy, American Civil Liberties Union Foundation, San Francisco, California; Lee P. Gelernt and Omar C. Jadwat, American Civil Liberties Union Foundation, New York, New York; Melissa Crow, Center for Gender and Refugee Studies, Washington, D.C.; Robert Pauw, Center for Gender and Refugee Studies, Seattle, Washington; Keren Zwick and Mary Georgevich, National Immigrant Justice Center,

Chicago, Illinois; for Amici Curiae American Civil Liberties Union, Center for Gender and Refugee Studies, and National Immigrant Justice Center.

---

## OPINION

PAEZ, Circuit Judge:

Lester J. Garcia Morales ("Garcia Morales" or "Petitioner"), Sheyla Monroy Tay, and their three minor children (collectively, "Petitioners"), natives and citizens of Guatemala, sought refuge in the United States after the same gang leader who murdered Garcia Morales's sister threatened to kill them. Petitioners moved hours away from their home to escape the gang's threats, but within two weeks, the gang found them, sent them a photo of their new front door, and again threatened to kill them. The police refused to help, offering to intervene only if they caught the gang leader in the act of murdering Garcia Morales. Out of fear for their lives, Petitioners fled Guatemala.

When Garcia Morales sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), an Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") determined that he was ineligible for asylum under the Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 C.F.R. §§ 208.33, 1208.33) ("the Rule"), which restricts asylum eligibility for asylum seekers who entered the United States between ports of entry between

May 11, 2023 and May 11, 2025.[1] *See id.* The IJ and BIA also determined that Petitioners failed to establish harm amounting to past persecution or that membership in their assumed particular social groups ("PSGs") was a central reason for their past or feared harm.

Garcia Morales raises a critical challenge to the validity of the Rule. The Rule, in turn, concerns a central promise that our law makes to noncitizens who seek refuge in the United States. Subject to narrow exceptions, the Immigration and Nationality Act ("INA") guarantees arriving noncitizens the right to apply for asylum, irrespective of how they entered the country. *See* 8 U.S.C. § 1158(a). This promise is codified in the first provision of the asylum statute, which provides that any noncitizen who arrives in the United States—"whether or not at a designated port of arrival"—may apply for asylum. *Id.*

In codifying this right, "Congress recognized that refugees fleeing imminent persecution do not have the luxury of choosing their escape route into the United States." *E. Bay Sanctuary Covenant v. Biden* (*East Bay I*), 993 F.3d 640, 658 (9th Cir. 2021). Rather than turning away asylum seekers who cross the border out of desperation or necessity, the asylum statute prioritizes the protection of refugees—in line with our international treaty commitments and our collective values as a country. *See id.* at 658, 672–75; *E. Bay*

[1] Garcia Morales's wife and children filed separate asylum applications and are derivative beneficiaries of his asylum application. In this opinion, we address the agency's determination that Petitioners are ineligible for asylum under the Rule and the agency's application of the nexus standard to Garcia Morales's asylum claim. We address Petitioners' other challenges to the agency's adverse asylum, withholding of removal, and CAT protection determinations in a memorandum disposition filed concurrently with this opinion.

*Sanctuary Covenant v. Garland* (*East Bay II*), 994 F.3d 962, 977 (9th Cir. 2020).

We previously invalidated an asylum regulation that conflicted with § 1158(a) of the INA. In *East Bay I*, we affirmed the district court's order enjoining a rule that restricted asylum eligibility for noncitizens who entered the U.S. between designated ports of entry. 993 F.3d at 669–71. Because § 1158(a) guarantees noncitizens who enter between ports of entry the right to seek asylum, we held that the government could not restrict asylum eligibility based on manner of entry. *Id.*

In *East Bay II*, we reaffirmed that any additional limitations the government imposes on asylum eligibility must be consistent with the asylum statute as a whole. 994 F.3d at 976–979. There, we invalidated a rule that required asylum seekers to have applied for and been denied asylum or other protection in a country through which they traveled, as inconsistent with the statute's concern for the safety of asylum seekers. *Id.*

In May 2023, when the government's Title 42 restrictions on asylum expired,[2] the government adopted the

[2] Invoking authority under 42 U.S.C. §§ 265, 268, the government directed immigration officials to expel noncitizens who lacked documentation or sought to enter the U.S. between ports of entry. *See* 42 C.F.R. § 71.40 (implementing regulation). Known as Title 42 restrictions, these orders began in March 2020 and were renewed periodically until May 2023. *See* Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060 (Mar. 26, 2020); Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 22424 (Apr. 22, 2020); Amendment and

Rule. The Rule limits asylum eligibility for asylum seekers like Garcia Morales, who entered the United States between May 11, 2023 and May 11, 2025, and did not present at a port of entry. 8 C.F.R. §§ 208.33, 1208.33.

We are guided by our decisions in *East Bay I* and *East Bay II*. The Rule effectively reimposes the restriction we invalidated in *East Bay I*. We reaffirm our holding that restricting asylum eligibility for noncitizens who enter between ports of entry impermissibly conflicts with § 1158(a) and the broader asylum statute. The agency therefore erred in concluding that Petitioners are ineligible for asylum pursuant to the Rule. We also hold that the agency committed legal error in its alternative merits determination, by failing to apply this court's complete mixed motives framework. For these reasons, we grant the petition for review and remand to the BIA for further proceedings.

---

Extension of Order Under Sections 362 and 365 of the Public Health Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31503 (May 26, 2020); Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020); Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828 (Aug. 5, 2021); Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 Fed. Reg. 19941 (Apr. 6, 2022).

# I.

## A.

The challenged Rule closely resembles two asylum eligibility rules that this court previously invalidated.

In November 2018, the government adopted an interim final rule and accompanying presidential proclamation which, together, barred asylum for noncitizens who entered the U.S. between ports of entry. *East Bay I*, 993 F.3d at 658; *see also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55952 (Nov. 9, 2018); Presidential Proclamation No. 9822, Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57661, 57663 (Nov. 9, 2018). Immigration organizations filed suit challenging the rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and in *East Bay I*, we held that the rule was unlawful. 993 F.3d at 675, 681.

In that case, we determined that the rule directly conflicted with the asylum statute because it required asylum seekers to "enter the United States at ports of entry to preserve their eligibility for asylum," notwithstanding § 1158(a)'s guarantee that noncitizens may seek asylum irrespective of their manner of entry. *Id.* at 669–70. We also held that the rule was arbitrary and capricious for two reasons. First, it conditioned asylum eligibility on manner of entry, a factor that had long been "worth little if any weight" in the discretionary decision of whether to grant asylum in a particular case. *Id.* at 671–72 (quotation omitted). Second, in light of the asylum statute's history and purpose, the rule contravened Congress's intent to preserve

asylum eligibility for people who enter between ports of entry. *Id.* at 672–74.

The government issued a second rule, in July 2019, which restricted asylum eligibility for noncitizens unless they could show that they had applied for and been denied asylum or equivalent protection in another country. *East Bay II*, 994 F.3d at 973; *see* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829, 33830 (July 16, 2019). In *East Bay II*, we concluded that the rule was substantively invalid. 994 F.3d at 988. We held that the rule conflicted with the statute's firm-resettlement and safe-third-country provisions, which address when a noncitizen who travels through another country "can be deemed sufficiently safe in that country to warrant a denial of asylum" in the U.S. *Id.* at 978. These provisions require that a noncitizen have a "genuinely safe option" in another country. *Id.* at 979. Because the rule required noncitizens to seek asylum elsewhere and did "virtually nothing to ensure that a third country is a 'safe option,'" we determined that it was inconsistent with the statute. *Id.* at 977 (quoting *E. Bay Sanctuary Covenant v. Barr,* 385 F. Supp. 922, 944 (N.D. Cal. 2019)).

**B.**

In February 2023, as the Title 42 restrictions were about to end, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") published notice of a proposed rule restricting asylum eligibility for noncitizens who arrive at the southwestern border ("SWB" or "southern border") after traveling through another country. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 11704 (Feb. 23, 2023).

The agencies published the final rule on May 16, 2023. *See* 88 Fed. Reg. 31314. Entitled "Circumvention of Lawful Pathways," the Rule applies a "presumption of ineligibility for asylum" to noncitizens who transited through another country before arriving at the southern border between May 11, 2023 and May 11, 2025. *See id*. at 31321; 8 C.F.R. §§ 208.33, 1208.33. Migrants who entered during the specified time period remain subject to the Rule "regardless of when the application is filed and adjudicated." 8 C.F.R. §§ 208.33(c)(1), 1208.33(d)(1). In promulgating the Rule, the government relied on its statutory authority in 8 U.S.C. § 1158(b)(1)(A) to grant asylum and its authority in 8 U.S.C. § 1158(b)(2)(C) to establish "additional limitations and conditions" on asylum eligibility. *See* 88 Fed. Reg. at 31323.

Under the Rule, all non-Mexican adults and families seeking asylum are presumed ineligible for such relief unless they meet one of the Rule's limited exceptions. To avoid the presumption of ineligibility, asylum seekers must show that they: (1) were authorized to travel to the U.S. "to seek parole, pursuant to a DHS-approved parole process"; (2) applied for and were denied asylum or other protection in another country through which they traveled; or (3) "[p]resented at a port of entry" with a prescheduled appointment made through a smartphone on the U.S. Customs and Border Protection One application ("the CBP One app"), or without an appointment if they can demonstrate "by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or

other ongoing and serious obstacle."[3] *See* 8 C.F.R. §§ 208.33(a)(2)(ii)(A)–(C), 1208.33(a)(2)(ii)(A)–(C).[4]

Asylum seekers who do not qualify for one of the above exceptions may rebut the presumption if they demonstrate "by a preponderance of the evidence that exceptionally compelling circumstances exist." *Id.* at §§ 208.33(a)(3), 1208.33(a)(3). Such circumstances include cases where the asylum seeker (or a qualifying family member) was a victim of human trafficking, faced "an acute medical emergency," or was subject to an "imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder" at the time they entered the U.S. *See id.*

The Rule's primary aim was to deter asylum seekers from entering the U.S. between ports of entry. 88 Fed. Reg. at 31427 ("[T]he purpose of this Rule is to discourage irregular migration."). The government justified the Rule as "necessary to prevent the expected increase in the number of migrants who would otherwise seek to travel without authorization to the United States" upon the expiration of Title 42 restrictions on asylum. *See id.* at 31326; *id.* at 31315–17. As the government emphasized in describing the Rule, to accomplish this objective, the Rule "imposes

[3] Effective January 20, 2025, the Administration terminated the CBP One appointment system and, effective March 25, 2025, certain parole processes that formed part of the Rule's "lawful pathways." Executive Order No. 14165 §§ 7(a)-(b), Securing Our Borders, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025); Termination of the Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025). We do not address the impact of the termination of these pathways on the Rule's validity because we conclude that these exceptions did not render the Rule lawful. *See infra* Section IV.B.

[4] The Rule also contains an exception for unaccompanied minors. 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i).

consequences" on asylum seekers who entered the U.S. between ports of entry. *Id.* at 31318; *see also id.* at 31324–26, 31328–29, 31341, 31361, 31369–70, 31416, 31430–32, 31444–45 (referencing "consequences").

At its core, the Rule severely limits asylum eligibility. The Rule effectively required asylum seekers to present at a port of entry to preserve their eligibility. *See, e.g.*, *id.* at 11729 (explaining that the Rule imposes a "disincentive for those who might otherwise cross without authorization between ports of entry"); *id.* at 31324 (explaining that the Rule is expected "to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States"). The government recognized that in pursuing its goal of reducing "irregular migration," the Rule would result in the denial of meritorious asylum claims. *See id.* at 31332 (acknowledging that "the [R]ule will result in the denial of some asylum claims that otherwise may have been granted").

**C.**

East Bay Sanctuary Covenant, joined by other advocacy organizations, challenged the validity of the Rule, arguing it conflicted with the asylum statute, was arbitrary and capricious, and was procedurally defective. The district court held that the Rule was substantively and procedurally invalid, relying on *East Bay I* and *East Bay II*, granted the plaintiffs' motion for summary judgment, and vacated the Rule under 5 U.S.C. § 706(2). *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1053–54 (N.D. Cal. 2023). We vacated the district court's judgment and remanded for additional proceedings in light of the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and the termination of the CBP One

appointment system and parole processes in the Rule. *See E. Bay Sanctuary Covenant v. Trump,* 134 F.4th 545, 547–48 (9th Cir. 2025). The district court reaffirmed its summary judgment order and again vacated the Rule.[5] *E. Bay Sanctuary Covenant v. Trump*, No. 18-CV-06810-JST, 2026 WL 1256873, at *9 (N.D. Cal. May 7, 2026). The government has filed a notice of appeal.

**D.**

**1.**

In September of 2020, Placido Alexander Lux García ("Placido"), a leader of the Mara-18 gang, murdered Garcia Morales's sister for failing to pay extortion to run her taxi business. A month later, Garcia Morales, who was also a taxi business owner, began receiving notes from Placido demanding extortion payments and warning that if he went to the police, the same thing would happen to him and his family. Placido sent fifteen notes threatening to kill Garcia Morales and his family and delivered six cellphones to Garcia Morales through his drivers.

On October 15, 2022, Placido texted and called Garcia Morales, demanding 8,000 quetzales monthly. Garcia Morales agreed to pay 1,000 quetzales monthly "because of fear that they [the Mara-18 gang] kill my family and I." The next day, Placido demanded 100,000 quetzales. Fearing

[5] While the district court's vacatur of the Rule prevents the BIA from applying the Rule to dismiss pending appeals, it does not moot the relief sought by Garcia Morales: namely, remand for further proceedings, because his order of removal was based in part on the Rule. *See Garcia v. Lawn*, 805 F.2d 1400, 1402 (9th Cir. 1986) ("The test for mootness of an appeal is whether the appellate court can give the appellant any effective relief in the event that it decides the matter on the merits in his favor. If it can grant such relief, the matter is not moot.").

death, Garcia Morales and his family relocated to a relative's house two hours away.

Ten days later, Placido and Mara-18 found them. Garcia Morales received a note under the gate of his new house titled "FOR LESTER AND SHEYLA DEATH HAHAHAHA." The note gave Garcia Morales ten days to pay 100,000 quetzales or Placido would murder the entire family, "even the dog of the house." The letter ended: "IF YOU GO TO THE POLICE YOU WILL REGRET IT, DEATH OR LIFE YOU DECIDE, DOG." Garcia Morales also received a texted photo of the front door at the new house, stating that Mara-18 had him under surveillance.

Garcia Morales reported the threats to the police. The police said that they "had lots of reports" about Placido but because he "belonged to a very big . . . criminal band," they could not take action unless they caught him in the act of murdering Garcia Morales.

Petitioners fled Guatemala on October 26, 2022. One night, the smuggler transporting Petitioners stopped the car, demanded more money, and called the cartel to tell them to kidnap Petitioners. Garcia Morales and his family escaped on a passing bus. Petitioners entered the U.S. in October 2023.

**2.**

Petitioners appeared unrepresented before the IJ. The IJ held that Petitioners were subject to the Rule's presumption of ineligibility for asylum because they entered between ports at the southern border in October 2023 and did not satisfy any of the Rule's exceptions. The BIA agreed, holding that the smuggler's threat to kidnap Petitioners was not "so 'imminent and extreme' as to rebut the presumption

of ineligibility." With respect to Petitioners' argument that the Rule conflicts with the INA, the BIA responded: "[W]e are bound by the rule and must apply it."

Alternatively, the IJ denied Petitioners' applications on the merits. The IJ held that Garcia Morales failed to establish a cognizable PSG or a nexus to a protected ground. The BIA conducted an independent review of the evidence and law and dismissed the appeal. The BIA assumed Petitioners had established a cognizable PSG based on their status as "taxi owners," "taxi business owners," "Guatemalans who do not comply with gang extortions," or "Guatemalans who have not complied with gang demands," but concluded that they failed to establish that membership in these groups was or would be a central reason for their past or feared harm.

We ordered supplemental briefing on the Rule's validity. *Garcia Morales v. Bondi*, No. 25-1760, 2026 WL 457554, at *1 (9th Cir. Feb. 18, 2026). Garcia Morales renews his argument that the Rule is inconsistent with the INA. The government argues that the Rule is within its statutory authority to grant asylum under 8 U.S.C. § 1158(b) and to establish "additional limitations and conditions" on asylum eligibility under 8 U.S.C. § 1158(b)(2)(C). *See* 88 Fed. Reg. at 31323.

## II.

When the BIA conducts its own review of the evidence and law, our review is limited to the BIA's decision except to the extent that it "expressly" adopts the IJ's opinion. *Garcia v. Wilkinson*, 988 F.3d 1136, 1142 (9th Cir. 2021); *Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010). In reviewing the BIA's decision, our review is limited to the grounds "explicitly" relied upon by the Board. *Budiono v.*

*Lynch*, 837 F.3d 1042, 1046 (9th Cir. 2016). We review factual determinations for substantial evidence and questions of law de novo. *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014). "If we conclude that the BIA's decision cannot be sustained upon its reasoning, we must remand." *Regalado-Escobar v. Holder*, 717 F.3d 724, 729 (9th Cir. 2013) (quoting *Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004)).

## III.

We have jurisdiction under 8 U.S.C. § 1252(a). Under 8 U.S.C. § 1252(f), only the Supreme Court has "jurisdiction or authority to enjoin or restrain the operation of" specified provisions of the INA, 8 U.S.C. §§ 1221–1232, "other than with respect to the application of such provisions to an individual [noncitizen] against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). The phrase "operation of" the specified INA provisions includes agency policies that "implement" them. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022). However, the jurisdictional "[l]imit on injunctive relief" in § 1252(f)(1) is inapplicable to this petition for review. 8 U.S.C. § 1252(f)(1).

Section 1252(f) applies only to the provisions it specifies, and the asylum statute, 8 U.S.C. § 1158, is not one of the provisions listed. *See* 8 U.S.C § 1252(f)(1) (referencing 8 U.S.C. §§ 1221–1232). By specifying only certain provisions, § 1252(f)'s "plain text makes clear that its limitations on injunctive relief do *not* apply to *other* provisions of the INA." *Gonzalez v. ICE*, 975 F.3d 788, 813 (9th Cir. 2020). That the asylum statute may ultimately affect some of the specified provisions does not bring it within the ambit of § 1252(f). *See Gonzales v. DHS*, 508

F.3d 1227, 1233 (9th Cir. 2007) (holding that § 1252(f) does not implicate the adjustment of status statute merely because it might have collateral effects on removal).

Even assuming a collateral impact on specified provisions could trigger § 1252(f), the statute establishes that circuit courts "retain the authority to 'enjoin or restrain the operation of' the relevant statutory provisions 'with respect to the application of such provisions to an individual [noncitizen] against whom proceedings under such part have been initiated.'" *Aleman Gonzalez*, 596 U.S. at 550 (quoting 8 U.S.C. § 1252(f)(1)); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999) (explaining that § 1252(f)(1) "does not extend to individual cases"). Garcia Morales is seeking relief in his individual case, not on a class-wide basis; thus, 8 U.S.C. § 1252(f) is inapplicable.

## IV.

We turn next to the Rule's validity. Petitioners argue that the Rule is inconsistent with the asylum statute, as interpreted by this court in *East Bay I* and *East Bay II*. We agree.

### A.

We first consider whether the Rule is "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C); *United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("[R]egulations, in order to be valid must be consistent with the statute under which they are promulgated").

The Rule limits asylum eligibility based on "whether or not [noncitizens entered] at a designated port of arrival." 8 U.S.C. § 1158(a)(1). Under the Rule, adults and accompanied minors who lack parole authorization and wish

to preserve their eligibility for asylum must decide *ex ante* whether to seek asylum in a transit country (an unlawful requirement under *East Bay II*) or present at a port of entry (an unlawful requirement under *East Bay I*). For those noncitizens who fail to obtain an asylum denial from a transit country before reaching the SWB and lack "exceptionally compelling circumstances," the Rule bars asylum eligibility if they enter between ports. 8 C.F.R. §§ 208.33(a)(2)–(3), 1208.33(a)(2)–(3). Put differently, under the Rule, noncitizens who enter between ports are ineligible for asylum absent a qualifying exception. Notwithstanding its framing as a "presumption of ineligibility," *see infra* Section IV.B, the Rule is thus best understood as an affirmative restriction based on manner of entry. *Id.* §§ 208.33(a)(1), 1208.33(a)(1).

This appeal therefore presents a similar question of statutory interpretation that we considered in *East Bay I*: namely, whether the asylum statute permits the government to restrict asylum eligibility for noncitizens who enter the U.S. between designated ports of arrival. *Compare* 83 Fed. Reg. 55934, *with* 88 Fed. Reg. 31314; *East Bay I*, 993 F.3d at 670–71.

Our task in interpreting a statute that "delegates discretionary authority to an agency" is to "independently interpret the statute and effectuate the will of Congress." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). We reaffirm our holding that pursuant to the "best reading of the statute," the government cannot deem noncitizens ineligible for asylum because they entered the U.S. between ports of entry. *Id.* at 400; *East Bay I*, 993 F.3d at 670–71. Because the Rule does just that, it is inconsistent with § 1158(a).

Congress codified the right to seek asylum when it enacted the Refugee Act of 1980. In doing so, Congress sought to "bring United States refugee law into conformance" with international treaty commitments, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 427, 436–37 (1987), and to "establish[] a more uniform basis for the provision of assistance to refugees," *East Bay I*, 993 F.3d at 674 (quoting Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980)). Recognizing that "refugees fleeing imminent persecution do not have the luxury of choosing their escape route into the United States," *id.* at 658, Congress provided that noncitizens could seek asylum "irrespective of [their] status," and irrespective of whether they arrived "at a land border or port of entry," Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Congress thus "mandated equity in its treatment of all refugees, however they arrived." *East Bay I*, 993 F.3d at 658 (citing 125 Cong. Rec. 35813–14 (1979) (statement of Rep. Holtzman)).

To "preserve[] that principle," *id.* at 658, when Congress amended the asylum statute in 1996, it specified that any noncitizen who arrives in the U.S., "whether or not at a designated port of arrival," may seek asylum, Pub. L. No. 104-208, Div. C, Title VI, § 604(a), 110 Stat. 3009-690 (1996).[6]

Today, the asylum statute provides that:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought

---

[6] For a more detailed discussion of the history of the asylum statute, refer to *East Bay I*, 993 F.3d at 672–75, and *East Bay II*, 994 F.3d at 969–72.

> to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a). We previously held that this guarantee—that noncitizens may apply for asylum, irrespective of how they entered the country—means that the government cannot restrict asylum eligibility based on a noncitizen's manner of entry. *East Bay I*, 993 F.3d at 670. We reached this conclusion by examining the text, context, and structure of § 1158.

The dissent principally reprises the same arguments we rejected in *East Bay I.* In the dissent's view, because "section 1158 splits asylum applications (§ 1158(a)) and eligibility (§ 1158(b)) into two different subsections," and the Rule does not prevent migrants from submitting *futile* asylum applications, it is "consistent" with § 1158(a)'s requirement that noncitizens be permitted to "apply for asylum." *Id.* We previously rejected this unconvincing reading of § 1158(a)(1).

Once again, we decline to merely pay lip service to the text of § 1158(a)(1). "To say that one may *apply* for something that one has no right to *receive* is to render the right to apply a dead letter." *Id.* at 670–671 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 772 (9th Cir. 2018)). While the Rule "facially conditions only who is *eligible* to receive asylum," it is "the equivalent of a bar to *applying* for asylum in contravention of a statute that forbids the Attorney General from laying such a bar on these grounds." *E. Bay Sanctuary Covenant*, 932 F.3d at 771.

"Explicitly authorizing a refugee to file an asylum application *because* he arrived between ports of entry" but proceeding to "deny[] the application for the same reason borders on absurdity," as the "consequences of denial at the application or eligibility stage are, to a refugee, the same." *East Bay I*, 993 F.3d at 670. "No such design can be attributed to a rational Congress," which "does not ordinarily enact self-defeating statutes." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013); *Exxon Mobil Corp. v. Corporacion Cimex, S. A. (Cuba)*, 146 S. Ct. 1909, 1919 (2026); *see also Castillo v. Bondi*, 140 F.4th 777, 785 (6th Cir. 2025) (Thapar, J., concurring) (rejecting an interpretation that "result[s] in . . . anomalies that no rational Congress would have intended").

Rather than attempt to muster an "account [of] why a rational Congress might wish" to permit the government to deny asylum eligibility for the "same reason" Congress "[e]xplicitly authoriz[ed]" asylum applications, the dissent simply contends this result is not absurd *enough* to warrant rejection. *Pereida v. Wilkinson*, 592 U.S. 224, 232 (2021); *East Bay I*, 993 F.3d at 670. In the dissent's view, a result is only anomalous when it is "so monstrous that all mankind would, without hesitation, unite in rejecting" it. Dissent 73 (quoting 1 Joseph Story, Commentaries on the Constitution of the United States § 427, at 411 (Fred B. Rothman & Co. 1991)). For one, the dissent is wrong: the Supreme Court has not so described the standard in a majority opinion in more than a hundred years. *See Blair v. City of Chicago*, 201 U.S. 400, 502 (1906).[7]

[7] The dissent previously adhered to our view of the standard. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 756 (9th Cir. 2025) (Bumatay, J., dissenting) (quoting *United States v. Lucero*, 989 F.3d 1088, 1098 (9th

More fundamentally, the dissent misunderstands our interpretive role. "What the rule of absurdity seeks to do is what all rules of interpretation seek to do: make *sense* of the text." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 235 (2012). In doing so, our task is to effectuate the "will of Congress." *Loper Bright Enters.*, 603 U.S. at 395. We consider "the language itself, the specific context in which that language is used, and the broader context of the statute" to identify the best reading of the law "as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Here, our task is to give effect to § 1158(a)(1)'s affirmative requirement that noncitizens be permitted to seek asylum regardless of their manner of entry, the Attorney General's authority under § 1158(b)(2)(C) to prescribe additional conditions on asylum eligibility, and the accompanying constraint that such criteria must be consistent with the remainder of the statute.

Because the absurdity canon is "an implementation of . . . the ordinary meaning rule," the relevant question is not whether a result is "monstrous," but whether a "reasonable person could intend" a given anomalous result. William N. Eskridge Jr., *Interpreting Law* 72 (2016); Scalia & Garner, *Reading Law* 235. For the third time, we hold that "[t]here is no good or plausible reason to think that Congress" at once mandated a refugee's right to *apply* for asylum based on their manner of entry and simultaneously permitted the government to deny asylum *eligibility* on that

Cir. 2021)) (explaining that while used "'sparingly,' the absurdity canon means we should 'not myopically focus[ ] on a single' term or phrase and instead we should 'evaluate the statute in context'"). The standard should not become more onerous when he disagrees with the result of its application.

same basis. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 790 (2025).

The dissent's sole effort to interpret § 1158(a) in its statutory context comes from the six statutory bars on asylum eligibility Congress established in 8 U.S.C. §§ 1158(b)(2)(A)(i)–(vi). These bars generally concern "either the safety of those already in the United States" or "the safety of refugees." *East Bay I*, 993 F.3d at 673. The dissent argues that by enacting statutory eligibility bars consistent with the rest of the statute, Congress silently sanctioned regulatory eligibility bars inconsistent with § 1158(a)(1). Not so. Unlike a regulation that conditions eligibility on a noncitizen's manner of entry, "the statutory asylum bars in the INA do not separately conflict with explicit text in section 1158(a)." *Id.* at 670. For example, while a noncitizen who "firmly resettled in another country" is ineligible for asylum, 8 U.S.C. § 1158(b)(2)(A)(vi), there is no provision in § 1158(a) "that affirmatively requires that migrants who were firmly resettled in another country be permitted to apply for asylum." *Id.* And rather than "enable[]" the dissent's reading, Congress protected its statutory limits from regulatory overreach, by requiring that any additional limitations be "consistent with" § 1158. Dissent 74; 8 U.S.C. § 1158(b)(2)(C).

Our task is also to understand "how ordinary people understand the rules that govern them." *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021). The dissent fails to account for how an ordinary reader would understand the right to apply for a benefit. Imagine that a California state statute requires that the University of California, Berkeley ("Berkeley") must accept applications without regard to the applicant's home state. The average applicant might not be surprised if she was denied admission, given Berkeley's 11

percent acceptance rate. But an applicant would be shocked if she was denied admission because a separate Berkeley policy barred the admission of California residents, based on their in-state status. No ordinary reader would understand such a bar as "consistent with" the statute. 8 U.S.C. § 1158(b)(2)(C).

Rather than discern the best reading of the statutory text, the dissent asks us to isolate one word—"apply"—from its surrounding text—"whether or not at a designated port of arrival." 8 U.S.C. § 1158(a). "Apply," the dissent contends, means only to "make an appeal or a request." Dissent 66 (quoting Webster's Third New Int'l Dictionary 105 (1993)). But "[t]o strip a word from its context is to strip that word of its meaning." *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring). That is, "two words together may assume a more particular meaning than those words in isolation," just as "a melody is more than the notes." *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011); *Helvering v. Gregory*, 69 F.2d 809, 811 (2d Cir. 1934) (Hand, J.). We reject the dissent's foray into "literalism," which is "the antithesis of context-driven interpretation." *Nebraska,* 600 U.S. at 512 (Barrett, J., concurring); Antonin Scalia, *A Matter of Interpretation* 24 (1997) ("[T]he good textualist is not a literalist."). Instead, we use the tools of statutory interpretation to "make *sense* of the text" and "giv[e] it the meaning that it would convey to a reasonable person." Scalia & Garner, *Reading Law* 235.

*

In sum, the "best reading" of § 1158, the interpretation faithful to congressional will and the understanding of the ordinary reader, is that the statute does not permit the government to condition asylum eligibility on manner of

entry. *Loper Bright Enters.*, 603 U.S. at 395. Because the Rule does just that, it directly conflicts with § 1158(a).

**B.**

The dissent and the government argue that the Rule is different because it is a presumption of ineligibility subject to exceptions. These exceptions include parole travel authorization, prior denial of humanitarian protection in another country, presenting at a port of entry with an appointment (or without one provided the asylum seeker satisfies one of the narrow accessibility exceptions), or demonstrating "exceptionally compelling circumstances." *See* 8 C.F.R. §§ 208.33(a)(2)–(3), 1208.33(a)(2)–(3).

The structure of the Rule does not save its validity. The Rule is impermissible because it requires asylum seekers to choose between presenting at a port with an appointment and obtaining an asylum denial in a transit country—and for those who fail to do so, bars asylum eligibility because they entered between ports of entry. *See East Bay I*, 993 F.3d at 670–71; 8 U.S.C. § 1158(a). That the Rule is a "rebuttable presumption" with narrow exceptions, 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1), rather than a "categorical ban" as in *East Bay I*, 993 F.3d at 669, is irrelevant. The prior rule's core problem was not solely its categorical nature, but rather the conditioning of asylum eligibility on a basis expressly contrary to § 1158(a)—manner of entry. *See* 993 F.3d at 670. Under § 1158(a), restricting asylum for *any* subset of noncitizens on account of how they entered the U.S. is impermissible.

We will not read statutory language in § 1158(a) out of the U.S. Code. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("This Court's duty [is] to give effect, if possible, to every clause and word of a statute."). Because the provision

expressly establishes the right to seek asylum irrespective of manner of entry, the government cannot bar *most* or even *some* noncitizens on this basis. A rule that conditions asylum eligibility on manner of entry necessarily violates the statute.[8] Thus, the Rule's exceptions cannot overcome its central statutory conflict.

---

[8] The dissent suggests that our decision prohibits the Attorney General from "impos[ing] *any* limitations on asylum eligibility." Dissent 76 (quoting *R-S-C v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017)). We do no such thing. In *R-S-C v. Sessions,* the Tenth Circuit considered an apparent conflict between two statutes: 8 U.S.C. § 1158(a)(1)'s provision that a noncitizen may apply for asylum "irrespective of such [noncitizen's] status," and 8 U.S.C. § 1231(a)(5), which provides that those "who illegally reentered the United States and whose prior removal orders have been reinstated—are 'not eligible and may not apply for any relief.'" 869 F.3d at 1183 (quoting 8 U.S.C. §§ 1158(a)(1), 1231(a)(5) (emphasis omitted)). The court considered whether the Attorney General's interpretation of the statute was reasonable under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In a footnote, the court rejected the petitioner's argument that a regulation that "carv[es] out [any] subset of [noncitizens] who may not apply for asylum is *not* consistent" with § 1158(a)(1)'s guarantee that a noncitizen may seek asylum "irrespective of such [noncitizen's] status." 869 F.3d at 1187 n.9 (quoting 8 U.S.C. § 1158(a)(1)). The court reasoned that such a reading would preclude *any* additional limitation on asylum eligibility, contrary to § 1158(b)(2)(C)'s plain text. *Id.* The dissent's attempt to "cut and paste" analysis from a decision with "no bearing on this case" is not well-taken. Dissent 71. We are not presented with a conflict between two statutes. Nor is our task to determine whether *Chevron* deference applies to an agency's interpretation of a statute. And we do not adopt a capacious interpretation of "irrespective of such [noncitizen's] status"—or any interpretation of this language at all. 8 U.S.C. § 1158(a)(1). We hold only that a regulation that limits asylum eligibility based on manner of entry is not "consistent with" § 1158(a)'s guarantee that noncitizens may seek asylum "whether or not [a noncitizen arrived] at a designated port of arrival." *Id.* §§ 1158(a)(1), 1158(b)(2)(C).

Even if we proceed past the core legal problem at the heart of the Rule, we only encounter more problems. Because the Rule is a blanket presumption of ineligibility subject to exceptions, the exceptions effectively coerce noncitizens to try to comply with at least one of them. But each exception is legally invalid or practically unavailable.

The exception for noncitizens who received authorization to enter the U.S. for a parole program, 8 C.F.R. §§ 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A), is not a true exception. These programs expressly required noncitizens who received parole to "fly at their own expense to an interior [port of entry], rather than arriving at the SWB." [9] Put differently, noncitizens with parole authorization would not have entered "at the southwest land border" and been subject to the Rule in the first place. 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). Even assuming parole was a viable option for noncitizens who entered at the southwest border, these programs were limited. They were only available to people from certain countries; were numerically capped; disqualified migrants who entered Panama or Mexico irregularly; and required migrants to have a U.S.-based supporter and to purchase a plane ticket at their own expense. 88 Fed. Reg. at 1273, 1276–77, 1279–80; *id.* at 1261, 1263; *id.* at 1249–50, 1252; *id.* at 31408–10.

The exception for noncitizens who present at a port of entry, 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B),

[9] Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1273 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1261 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1249 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1279–80 (Jan. 9, 2023); Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040, 25041 (Apr. 27, 2022).

is better understood as an affirmative requirement to preserve asylum eligibility. *See* Section IV.A. As explained at length, the port of entry requirement at the heart of the Rule is unlawful. *Id.*; *East Bay I*, 993 F.3d at 670–71.

Making matters worse, the Rule is even more restrictive than the prior rules because it limits asylum for people who attempted to enter at a port of entry without the requisite appointment. *See* 8 C.F.R. §§ 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Appointments were only available through the app's lottery system and accessible only with a smartphone. 88 Fed. Reg. at 31401. While the Rule contained an exception for those unable to use or access the app, this exception captured only "a narrow set of circumstances." *Id.* at 31406. It did not apply to someone who could not afford a smartphone or who could not read in one of the app's three available languages. *Id.* at 31401, 31403, 31406. And the exception for technical failure only "cover[ed] technical failures of the app itself . . . rather than a situation in which a migrant is unable to schedule an appointment due to high demand or one where there is a fleeting, temporary technical error." *Id.* at 31407.

That leaves the exception for noncitizens who applied for and were denied asylum or other humanitarian protection in a transit country, *see* 8 C.F.R. §§ 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This condition is both illegal and illusory. As we previously held in *East Bay II*, the government cannot require asylum seekers to apply for and be denied asylum or other protection in a transit country because such a requirement conflicts with the statute's concern for the safety of asylum seekers.[10] 994 F.3d at 978–

[10] The dissent argues that we should overrule *East Bay II* because that decision "inject[ed] into the statute a purpose that is not codified within

79. Predictably, the data makes clear that requiring noncitizens fleeing persecution to obtain an asylum denial in a transit country is also not feasible. When the prior transit requirement was in effect, fewer than two percent of asylum seekers were able to demonstrate that they sought and were denied protection in a country through which they transited *or* that they qualified for the exception for trafficking victims. Nothing has changed with the Rule's newest iteration. In the first four and a half months after the Rule took effect, just four percent of migrants could establish either an asylum denial from a transit country *or* an inability to use the CBP One application to make an appointment at a port of entry.

Finally, requiring noncitizens who cannot meet one of these cabined exceptions to rebut the presumption of ineligibility by demonstrating "exceptionally compelling circumstances" does not nullify the Rule's inconsistency with the asylum statute. When an action is not "mandatory," the government cannot demand a showing of "extraordinary circumstances" to justify departure from its preferred action. *See Gall v. United States*, 552 U.S. 38, 46–47 (2007). Thus, because the Rule's exceptions are either legally invalid or practically unavailable to noncitizens at the SWB, a carveout for "exceptionally compelling circumstances" cannot salvage the Rule's validity.

---

it." Dissent 78 (quoting *Rincon Band of Luiseno Mission Indians of Rincon Rsrv. v. Schwarzenegger*, 602 F.3d 1019, 1034 (9th Cir. 2010)). But as explained at length in *East Bay II*, Congress's requirement that a "'safe option' be genuinely safe," is codified within the safe-third-country and firm-resettlement bars and "support[ed]" by the statute's "plain language." *Rincon*, 602 F.3d at 1034; *see East Bay II*, 994 F.3d at 977–78.

Moreover, like the other exceptions, this is a remarkably "narrow" carveout. *See* 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3); 88 Fed. Reg. at 31380 (describing this option as "narrow"). It applies to noncitizens who experienced human trafficking, a severe medical emergency, or an "imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," and only if they faced these risks "at the time of entry" into the U.S. *See id.* This petition for review demonstrates that the agency views this exception as an exceedingly limited one. As Petitioners credibly testified, the smuggler who was transporting them to the U.S. stopped their car in the middle of the night and called the cartel with instructions to kidnap Petitioners after they were unable to pay him more money. However, the agency deemed this threat not sufficiently "'imminent and extreme' as to rebut the presumption of ineligibility."[11]

For adults and accompanied minors fleeing persecution without prior parole, the Rule's narrow exceptions effectively created a forced choice between entering at a port of entry or obtaining an asylum denial in a transit country to preserve their eligibility. We previously held that each of these conditions was independently invalid. *See East Bay I*, 993 F.3d at 670–71; *East Bay II*, 994 F.3d at 978–79. Compelling asylum seekers to choose between these two independently invalid conditions to preserve their eligibility is unlawful. *See New York v. United States*, 505 U.S. 144,

[11] Because we hold that the Rule is inconsistent with § 1158(a), we do not address Garcia Morales's alternative argument that he in fact rebutted the presumption of ineligibility under the Rule based on this threat.

176 (1992) ("A choice between two [illegally] coercive regulatory techniques is no choice at all.").

The Rule's limited exceptions do not obviate the fundamental statutory conflict—if anything, they amplify it. Because the exceptions are either unlawful or narrow, they function as a coercive mechanism for obtaining compliance with the invalid Rule. Section 1158(a) prohibits the government from requiring asylum seekers to enter the U.S. at ports of entry. But the Rule effectively does so, by requiring adults and accompanied minors who entered between ports of entry to show that they meet one of the Rule's narrow exceptions. And even assuming the Rule's exceptions were legally permissible, because they are narrow, they cannot save the invalid Rule. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 115 (2022) (holding that "narrow exemptions" that were "largely illusory" did not save an otherwise invalid regulation); *see also East Bay II*, 994 F.3d at 973 (holding rule invalid despite a narrow exception for victims of human trafficking).

For these reasons, the Rule's narrow exceptions do not eliminate its fundamental conflict with § 1158(a).

**C.**

The government argues that it has the statutory authority to adopt a rule that restricts asylum eligibility, notwithstanding the language in § 1158(a). In support of this argument, the government relies on its general authority to grant asylum in 8 U.S.C. § 1158(b) and its authority to "establish additional limitations and conditions" on asylum eligibility that are "consistent with [the asylum statute]" in 8 U.S.C. § 1158(b)(2)(C). *See* 88 Fed. Reg. at 31323; *accord* Dissent 67 (characterizing the Rule as "an exercise of the

Executive's discretionary authority"). The latter provision is nested in a subsection that identifies "exceptions" to the broad statement of threshold eligibility in 8 U.S.C. § 1158(b). Any additional regulatory limitations on asylum eligibility must be "consistent with" the asylum statute. *See* 8 U.S.C. § 1158(b)(2)(C). As we have explained, the Rule is not. *See East Bay I*, 993 F.3d at 670.

Because the government conflates its broad authority to grant asylum with its limited "discretion to prescribe criteria for asylum eligibility," we reiterate that the government's "discretion to deny asylum to eligible" noncitizens is "different from [its] discretion to prescribe criteria for asylum eligibility." *East Bay II*, 994 F.3d at 979. The difference between the two provisions bears emphasizing. The government has broad discretion to grant or deny asylum. *Cardoza-Fonseca*, 480 U.S. at 444–45; 8 U.S.C. § 1158(b)(1)(A). By contrast, the government's authority to establish "additional limitations and conditions" on asylum eligibility is "constrained" by § 1158(b)(2)(C)'s requirement that such regulations be "consistent with" the asylum statute.[12] *East Bay II*, 994 F.3d at 979. We must respect this meaningful variation in statutory language. "If the Attorney General's discretion to add limitations and conditions for

[12] We agree with the dissent that Congress permitted the "Executive to adopt broad rules that applied across all asylum cases" through 8 U.S.C. § 1158(b)(2)(C). Dissent 75. But we disagree that "Congress did not address" the permissibility of entry-based eligibility restrictions and thus sanctioned "tighter restrictions" on that basis. *Trump v. Hawaii*, 585 U.S. 667, 690 (2018). Congress expressly required that any regulation further limiting asylum eligibility be "consistent with" the asylum statute, including the statute's requirement that noncitizens be permitted to seek asylum irrespective of their manner of entry. 8 U.S.C. § 1158(b)(2)(C).

asylum eligibility were the same as his discretion to deny asylum to eligible aliens, the 'consistent with' language in § 1158(b)(2)(C) would be superfluous." *Id.*; *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that . . . no part will be inoperative or superfluous, void or insignificant." (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, at 181–86 (rev. 6th ed. 2000))). Section 1158(b)(2)(C) thus limits the scope of the government's authority to adopt eligibility rules. *Id.* The Rule is not "consistent with" the asylum statute, as required by § 1158(b)(2)(C); rather, as discussed above, it conflicts with § 1158(a).

In the dissent's view, we should broadly construe permissible limitations under § 1158(b)(2)(C) given Congress's historical grant of "broad Executive authority to dictate who is entitled to asylum." Dissent 64. But the general statutory history identified by the dissent is of little help in interpreting § 1158(a)'s specific guarantees. We consider statutory history when it illuminates congressional intent. For example, when Congress amends a statute and omits prior language, we presume it intended a meaningful variation in statutory meaning. *See Van Buren v. United States*, 593 U.S. 374, 393 (2021). Similarly, where a court interprets a statutory provision and Congress disagrees, it may amend the law to so clarify. *See Hawkins v. United States,* 30 F.3d 1077, 1082 (9th Cir. 1994). Conversely, where Congress agrees with a court's interpretation of statutory language, it may choose to reenact that same language and bring the old meaning with it. *See Lorillard v. Pons*, 434 U.S. 575, 583 (1978). The dissent offers no comparable analysis. Instead, the dissent seeks to draw an overarching congressional purpose from the general arc of immigration law and to use that purported purpose to

override the law's plain text. That is not our role. *See In re Transcon Lines,* 58 F.3d 1432, 1437 (9th Cir. 1995) ("[I]t is inappropriate for a court to invoke the 'broad purpose' of a statute to invalidate specific provisions.").

The dissent's argument also fails on the merits. Even assuming Congress generally sought to expand executive authority to deny asylum, "no law pursues its purpose at all costs." *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion). Any "textual limitations upon a law's scope" are as much "a part of its 'purpose' [as] its substantive authorizations." *Id.*

Consider the statutory history of § 1158(a) and § 1158(b)(2)(C), the contested provisions in this petition for review. The Refugee Act of 1980 in relevant part instructed the Attorney General to "establish a procedure" for noncitizens "physically present in the United States or at a land border or port of entry . . . to apply for asylum." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). When Congress amended the asylum statute in 1996, it specified that any noncitizen who "arrives in the United States (whether or not at a designated port of arrival) . . . may apply for asylum." Pub. L. No. 104-208, Div. C, Title VI, § 604(a), 110 Stat. 3009-690 (1996). Congress thus went out of its way to specify that the right to seek asylum applies irrespective of whether a noncitizen entered at a port. *See Crawford v. Burke*, 195 U.S. 176, 190 (1904) ("[A] change in phraseology creates a presumption of a change in intent."). And in the same amendment, Congress chose to "insert the 'consistent with' language into § 1158(b)(2)(C), adding it to an earlier draft [] that had not contained that language." *East Bay II*, 994 F.3d at 980; *compare* H.R. Rep. No. 104–469, at 80 (1996), *with* H.R. Rep. No. 104–828, at 164 (1996) (Conf. Rep.). To the extent statutory history

bears on our analysis, it establishes that protecting the right to seek asylum irrespective of manner of entry and qualifying executive power to constrain asylum eligibility were congressional priorities.

**D.**

The Rule is also inconsistent with the broader asylum scheme because it conflicts with the threshold eligibility established in the statute. In devising the asylum scheme, Congress struck a careful balance between broad threshold eligibility for asylum seekers and broad discretion for the government to determine whether to grant asylum. *See* 8 U.S.C. § 1158(b). "Asylum is a two-step process." *Gulla v. Gonzales*, 498 F.3d 911, 915 (9th Cir. 2007) (quoting *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004)). First, an asylum seeker must establish that he is statutorily eligible for asylum. Second, after establishing eligibility, he must "convince the Attorney General to exercise his discretion and grant asylum." *Singh v. Bondi*, 130 F.4th 848, 857 (10th Cir. 2025) (quoting *Diallo v. Gonzales*, 447 F.3d 1274, 1282 n.4 (10th Cir. 2006)); *accord. Gulla*, 498 F.3d at 915; *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012).

Congress adopted broad threshold eligibility for asylum: in general, an asylum seeker who applies and meets the definition of a refugee is eligible. 8 U.S.C. § 1158(b); *Cardoza-Fonseca*, 480 U.S. at 443–44.[13] Congress used expansive language to define the term "refugee" and adopted a relatively low standard for asylum eligibility. *Id.* at 423,

[13] *See also id.* at 423–24 (distinguishing the "narrower class" of noncitizens entitled to withholding of removal from the "broader" class of refugees eligible for asylum).

431. Enacting broad threshold eligibility was a deliberate decision: "although Congress could have crafted a narrower definition [of asylum], it chose to authorize the Attorney General to determine which, if any, eligible refugees should be denied asylum." *Id.* at 444–45.

Once an applicant establishes eligibility, Congress granted the government the discretionary authority to decide whether an applicant merits asylum. *Id.* at 444 ("Congress has assigned to the Attorney General and his delegates the task of making these hard individualized decisions."). In exercising its discretion and weighing the equities of an asylum seeker's case, the government must consider all relevant factors, including favorable and unfavorable ones. *Gulla*, 498 F.3d at 916.

As we recognized in *East Bay I*, the government may consider manner of entry as part of its individualized, discretionary decision to grant asylum in a given case. 993 F.3d at 671 (citing *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987), *superseded in part by statute on other grounds as stated in Andriasian v. INS*, 180 F.3d 1033, 1043–44 (9th Cir. 1999)). But this factor has only ever been relevant at the second step of the asylum process—as part of the holistic discretionary determination of whether to grant asylum. *Id.* It has never been relevant to whether noncitizens are prima facie eligible for asylum. *Id.*

This distinction is critical to understanding how the Rule upsets the asylum scheme. Previously, when the government considered manner of entry, a factor "worth little if any weight" in adjudicating asylum, *id.* at 671 (quotation omitted), it considered this factor as one of many factors relevant to its discretionary determination. *See Gulla*, 498 F.3d at 916; *see also Matter of Pula*, 19 I. & N.

Dec. at 472–74. In contrast, the Rule renders asylum seekers ineligible for asylum, irrespective of the equities of their individual case.

The government argues that the Rule is itself discretionary, rather than a preclusive bar to asylum eligibility, and thus fits within the government's broad discretionary function. But the Rule's text plainly contradicts the government's suggestion that the equities of a migrant's case may overcome the presumption of ineligibility. Where a text "explicitly enumerates certain exceptions," as the Rule does, generally "additional exceptions are not to be implied." *United States v. Smith*, 499 U.S. 160, 167 (1991) (quoting *Andrus v. Glover Construction Co.*, 446 U.S. 608, 616–617 (1980)). Instead, the "proper inference" is that the drafter "limited" the exceptions "to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). Nor has the government identified a single case where the BIA applied the Rule as a discretionary consideration, rather than a binding eligibility bar. Instead, the BIA has consistently explained that it is "bound by the [R]ule and must apply it," including in cases where the IJ held that an applicant satisfied all the criteria for asylum—and thus would be eligible for asylum—"[b]ut for" the Rule. Thus, the Rule is not merely one of many factors relevant to the government's individualized decision about who merits asylum.

Although a noncitizen's manner of entry can be one of several discretionary factors relevant to an individualized determination of whether to grant asylum, *see East Bay I*, 993 F.3d at 671 (citing *Matter of Pula*, 19 I. & N. Dec. at 473), it is not a valid additional ground on which the government may condition eligibility for asylum given the

text of § 1158(a).[14] Any new conditions must be "consistent with" the asylum statute, and the Rule patently conflicts with the statutory constraint imposed by 8 U.S.C. § 1158(a). Allowing the Attorney General to implement the Rule because of his limited authority to establish additional conditions would permit him to rewrite the asylum statute. That is not the system Congress established.

* * *

In sum, Congress specifically provided in § 1158(a) that a noncitizen who enters the U.S. between ports of entry is not barred from applying for asylum. *See* 8 U.S.C. § 1158(a). The Rule, however, bars asylum claims of migrants like Garcia Morales, who entered between ports of entry. *See* 8 C.F.R. §§ 208.33, 1208.33. As before, "it would be hard to imagine a more direct conflict" with the statute. *East Bay I*, 993 F.3d at 670. We again hold that restricting asylum eligibility based on manner of entry conflicts with the text of § 1158(a) and the asylum statute. *See id.* Therefore, the BIA erred in dismissing Petitioners' appeal based on the Rule.

## V.

None of the remaining counterarguments raised by the dissent nullify the Rule's inconsistency with § 1158(a).

---

[14] The dissent accuses us of "overruling" precedent recognizing that the government may consider manner of entry in its discretionary determination. Dissent 70. We do no such thing. Again, the statute requires that any regulations that impose additional conditions on asylum eligibility must be "consistent with" § 1158. 8 U.S.C. § 1158(B)(2)(C). No similar constraint limits the government's discretion to deny asylum in an individual case; therefore, the statute permits the government to consider manner of entry at the second step.

**A.**

In a final effort to save the Rule, the dissent argues that manner of entry is "irrelevant" to the Rule. Dissent 70. In the dissent's view, the Rule's presumption of ineligibility applies "equally" to those who present at ports and those who enter between ports. For one, the dissent argues, the Rule exempts noncitizens granted parole, noncitizens who obtain an asylum denial in a transit country, and noncitizens who have "exceptionally compelling circumstances" from its presumption of ineligibility. 8 C.F.R. §§ 208.33(a)(3), 1208.33(a)(3). And apart from these exceptions, the dissent points out, noncitizens who present at a port of entry without a CBP One appointment are presumed ineligible, and some noncitizens who enter between ports are not subject to the Rule. The dissent's argument that the exceptions swallow the Rule is nonsensical.

In the dissent's view, any exceptions erase the basis of the Rule's presumptive limitation on asylum eligibility. But we did not hold in *East Bay I* that only regulations that *exclusively* turn on manner of entry are inconsistent with the asylum statute. Our holding stemmed from the rule's substantive inconsistency with § 1158(a)(1), not its categorical nature. *East Bay I*, 993 F.3d at 670. As applied here, the Rule is unlawful because it coerces noncitizens to choose *ex ante* between two illegal options—presenting at a port or obtaining an asylum denial in a transit country—to preserve asylum eligibility, and for those who fail to do so, bars asylum eligibility because they entered between ports of entry. *See supra* Section IV.A–B. Neither the Rule's

framing as a "presumption" of ineligibility nor its narrow exceptions can overcome this inconsistency.[15]

Nor is the Rule lawful because it is *more* restrictive than the rule we invalidated in *East Bay I*. The dissent argues that because the Rule requires those who enter at ports to have an appointment, it "turns not on manner of entry but on whether one has a CBP One appointment." Dissent 77. We struggle to see how that is correct. If a noncitizen enters between ports but happens to have scheduled a CBP One appointment, the appointment does not preserve eligibility. Or, from another angle, noncitizens could only make CBP One appointments if they presented at a port. However you slice it, the appointment is layered on top of the core requirement: present at a port.

Finally, the dissent objects, some noncitizens who enter between ports are not presumed ineligible. The dissent points out that the Rule does not apply to Mexican nationals, or to noncitizens who enter between ports at the northern land border with Canada, by sea from the Atlantic Ocean, or after the Rule expired. But it is of no moment that the Rule did not bar asylum eligibility for *all* noncitizens who entered between ports for *all* time. What makes the Rule unlawful is that it rendered a subset of noncitizens ineligible for asylum in part because of their manner of entry into the country.

For these reasons, we reject the dissent's attempt to recast manner of entry as irrelevant to the Rule. We instead

---

[15] Indeed, if the mere framing of a limitation as a "presumption" of ineligibility were to insulate regulations, as the dissent suggests, the government could promulgate a patently unlawful regulation presuming *every* noncitizen is ineligible for asylum absent "exceptionally compelling circumstances."

agree with the government that the Rule imposes a "disincentive for those who might otherwise cross without authorization between ports of entry" and seeks to "drive[] down . . . encounters at the border." 88 Fed. Reg. at 11729.

**B.**

The dissent offers various arguments that boil down to one: our dissenting colleague disagrees with *East Bay I* and *II*. While we have responded to the dissent's recycled arguments on the merits, we also reiterate that we are bound by our controlling precedent. Under *East Bay I*, a regulation that conditions asylum eligibility on manner of entry is not "consistent with" § 1158(a). As the Rule in part conditions asylum eligibility on how noncitizens entered the country, it is inconsistent with § 1158(a).

Instead of focusing on how the Rule is purportedly distinguishable, the dissent principally seeks to relitigate *East Bay I* and *II*. The dissent's core position is that the government may lawfully promulgate a regulation categorically barring asylum eligibility based solely on noncitizens' manner of entry or failure to obtain an asylum denial in a transit country. But this court has twice rejected these same theories. And this court has twice declined to rehear these same arguments en banc. We cannot overrule settled law, as the dissent seeks to do. *See United States v. Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013).

Finally, the dissent resorts to arguing that our decision is motivated by policy rather than the law. But an interpretation of a statute is not policy-motivated merely because the dissent disagrees with it. We have interpreted the statute "based on the traditional tools of statutory construction, not [our] individual policy preferences." *Loper Bright Enters.*, 603 U.S. at 403. It is our dissenting

colleague who would ignore this circuit's precedent in favor of an interpretation unmoored from the law Congress enacted.

## VI.

Apart from Petitioners' purported ineligibility for asylum based on the Rule, the IJ also concluded that, in the alternative, he would deny Petitioners' application on the merits. Specifically, the IJ held that Petitioners failed to establish a nexus to a protected ground, reasoning that Placido's motivation was monetary.

On appeal, the BIA conducted an independent review of the evidence and the law. *See Umana-Escobar v. Garland*, 69 F.4th 544, 551–52 (9th Cir. 2023). The BIA assumed that Garcia Morales presented cognizable social groups of "taxi owners," "taxi business owners," "Guatemalans who do not comply with gang extortions," or "Guatemalans who have not complied with gang demands," but concluded that he failed to establish mixed motives for his harm, i.e., that his assumed PSGs "standing alone, would have led Placido to harm [him]." "Because we are bound to consider 'only the grounds relied upon by th[e] agency,' we also assume for the sake of argument that these are cognizable social groups for purposes of evaluating the BIA's nexus determination." *Wilkinson*, 988 F.3d at 1143 (quoting *Regalado-Escobar*, 717 F.3d at 729) (assuming property ownership was a cognizable PSG).

Because the BIA failed to apply our complete mixed motives framework in holding that Garcia Morales failed to establish a legally sufficient nexus to a protected ground, we grant the petition for review and remand to the BIA for reconsideration. *Regalado-Escobar*, 717 F.3d at 729; *Singh v. Garland*, 118 F.4th 1150, 1165 (9th Cir. 2024).

**A.**

To qualify for asylum, a petitioner must establish that membership in his proposed PSG "was or will be at least one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). We have recognized that "persecutors[] often have mixed motives." *Wilkinson*, 988 F.3d at 1143 (quoting *Barajas-Romero v. Lynch*, 846 F.3d 351, 357 (9th Cir. 2017)). "[P]ersecution may be caused by more than one central reason" and an applicant is not required to "prove which reason was dominant." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc) (quoting *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009)). Accordingly, we have recognized the viability of "extortion-plus" claims, where a persecutor who extorts someone is motivated by both money and "also by a petitioner's protected characteristic." *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1020 (9th Cir. 2023).

There are two distinct ways that mixed motives can constitute "one central reason" for an applicant's past or feared harm. *Manzano v. Garland*, 104 F.4th 1202, 1207 (9th Cir. 2024). A motive is a central reason for harm if (1) "that motive, standing alone, would have led the persecutor to harm the applicant," or (2) "'the persecutor would not have harmed the applicant if such motive did not exist' and the motive was more than 'incidental' or 'tangential.'" *Id.* at 1207 (quoting *Rodriguez Tornes v. Garland*, 993 F.3d 743, 751 (9th Cir. 2021)).

Importantly, "[t]hese two potential ways to show a sufficient causal nexus to a protected ground are not the same." *Id.* at 1208. As this court explained in *Manzano v. Garland*, sometimes, a "protected ground will be sufficient [grounds for persecution] on its own, but it won't be a but-

for cause because there is another unprotected ground that would be sufficient on its own." *Id.* at 1209. Imagine a persecutor who harbors animus towards Muslims (a protected ground) and towards wealthy people (an unprotected ground), such that either reason, on its own, would be sufficient to cause the persecutor to act. If the persecutor harmed a wealthy Muslim, the protected ground of religion would not be a but-for cause of the harm, because the persecutor would also have harmed any other wealthy person. But under our precedent, this applicant nonetheless would have established a legally sufficient nexus, because her protected ground of religion, "standing alone," would have caused the persecutor to act. *Id.* at 1208.

The same logic applies to the "but-for" test. That is, a sufficient nexus may also be established where "a protected ground [is] a but-for cause of the harm and play[s] more than a minor role, but it [wouldn't] be sufficient on its own to cause the harm." *Id.* Imagine instead a persecutor who harbors animus towards Muslims and mild irritation towards wealthy people. His animus towards Muslims would not be sufficient, "standing alone," to cause him to act. *Id.* Nonetheless, if the persecutor would not have harmed a wealthy Muslim absent his religion, the applicant has established a legally sufficient nexus. Accordingly, the BIA "cannot ignore" either test, because an applicant may satisfy either to demonstrate a legally sufficient nexus to a protected ground, and need not satisfy both. *Id.* at 1209.

Here, the BIA committed legal error by conflating the mixed motives tests. The BIA considered whether Garcia Morales's membership in the assumed PSGs of "taxi owners," "taxi business owners," or "Guatemalans who do not comply" with gang extortions or demands, "standing alone, would have led Placido to harm" him. But the agency

failed to consider whether Placido "would *not* have harmed" Garcia Morales absent his membership in these assumed PSGs, and whether this motive was more than "incidental" or "tangential." *Parussimova*, 555 F.3d at 741 (emphasis added); *Manzano*, 104 F.4th at 1207 (quoting *Rodriguez Tornes*, 993 F.3d at 751). Instead, the BIA concluded, for a second time, that Placido would not have targeted Garcia Morales based on his protected traits, standing alone. The BIA's failure to apply the complete framework for discerning a sufficient causal nexus to a protected ground was legal error.

On remand, the agency must consider whether Placido would have harmed Garcia Morales absent his membership in these assumed PSGs, and whether any mixed motives were more than incidental. Garcia Morales credibly testified to several facts relevant to the agency's determination.[16] For one, he testified that *all* taxi owners were targeted by Mara-18. And "each time" taxi owners reported Mara-18 to the police, the gang retaliated by murdering them. Garcia Morales also testified that he only began to receive extortion demands and threats after starting his taxi business. In contrast, he never received threats or extortion demands through his two restaurant businesses. Furthermore, Garcia Morales's sister, who was also a taxi business owner, was murdered by Placido for failing to comply with his demands.

The agency might conclude that although Garcia Morales's status as a "taxi business owner" or a "Guatemalan[] who ha[s] not complied with gang demands," standing alone, would not have led Placido to harm him, he

[16] Because the agency found Garcia Morales credible, we accept his testimony as true. *Cruz-Navarro v. INS*, 232 F.3d 1024, 1028 (9th Cir. 2000).

still established a sufficient nexus to a protected ground because he would not have faced harm *absent* his status as a "taxi business owner" or his filing of a police report. *Parussimova*, 555 F.3d at 741. But this is a determination for the BIA, not us, to make. "[W]here the BIA applies the wrong legal standard to an applicant's claim, the appropriate relief from this court is remand for reconsideration under the correct standard, not independent review of the evidence." *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006); *Singh,* 118 F.4th at 1165. As much as the dissent wishes to prognosticate about the "logical conclusion" of the evidence, it is not our role to guess how the agency might have weighed the evidence if it applied the right legal rule. Dissent 85. Instead, we must remand for the agency to apply the correct standard in the first instance.

**B.**

The dissent strains to justify the BIA's clear legal error. To start, the dissent contends that the BIA in fact applied both mixed motives standards. Even if the BIA failed to do so, the dissent argues that the BIA was not required to address Garcia Morales's argument that Placido would not have harmed him but-for his PSG membership. Each argument falls short.

The dissent's claim that "the BIA did analyze these two 'ways'" of establishing mixed motives is based on an obvious misreading of the BIA decision. Dissent 86. True, the BIA concluded that "the [Petitioners] have not shown that if Placido's motive for monetary gain . . . did not exist, he still would have targeted them based on any of their proposed particular social groups." But this is not the "second *Manzano* way for a mixed motive." *Id*. The BIA did not consider whether Placido would not have harmed

Garcia Morales if he were only wealthy, but not a wealthy *taxi owner*, as the but-for mixed motives standard requires. Instead, the BIA again concluded that Placido would not have targeted Garcia Morales based on his protected traits alone. As we explained in *Manzano,* the agency commits legal error where it conflates the two "potential ways to show a sufficient causal nexus to a protected ground," as it did here. 104 F.4th at 1208.

Our decision does not establish any "new rule." Dissent 85. We hold only that the BIA must apply the correct legal standard and address arguments properly raised by petitioners, consistent with blackletter law. We previously clarified that the BIA "cannot ignore" the distinct mixed motives tests or suggest that "[standing alone] cause is *required* to satisfy the 'one central reason' standard." *Manzano*, 104 F.4th at 1207–09. Our conclusion that the agency erred is thus based on its failure to "apply the correct standard." Dissent 87 (quoting *Rebollo-Jovel v. INS*, 794 F.2d 441, 449 (9th Cir. 1986) (Canby, J., concurring in part and dissenting in part)).

Nor do we establish any new legal principle by requiring the BIA to address arguments properly raised by a petitioner. Both before the BIA and on appeal, Garcia Morales argued that while Placido was in part motivated by money, he would not have persecuted Garcia Morales but-for his protected traits, which were "key reasons" for his persecution. But the BIA failed to apply the relevant but-for causation standard to evaluate whether Placido harbored mixed motives. It "goes without saying" that the BIA is "not free to ignore arguments raised by a petitioner." *Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005). The dissent would permit the BIA to do just that.

For these reasons, we remand for the agency to apply the complete mixed motives framework and to consider the remaining elements of Garcia Morales's asylum claim.

## VII.

We hold that the agency erred in concluding that Petitioners are ineligible for asylum pursuant to the Rule, because the Rule is inconsistent with the asylum statute. We also hold that the agency committed legal error in its mixed motives analysis. For these reasons, we grant the petition for review and remand for further proceedings consistent with this opinion and the concurrently filed memorandum.

**PETITION GRANTED; REMANDED.**

Petitioners shall recover their costs on appeal.

---

BUMATAY, Circuit Judge, dissenting:

Once again, the Ninth Circuit fails to understand that the political branches—not judges—set asylum policy for our country. In the Immigration and Nationality Act ("INA"), Congress delegated to the Executive broad authority to establish "limitations and conditions" on asylum eligibility as long as they are "consistent" with the asylum statute. 8 U.S.C. § 1158(b)(2)(C). This makes sense because "the President has inherent authority to exclude aliens from the country." *Trump v. Hawaii*, 585 U.S. 667, 712 (2018) (Thomas, J., concurring). And so our job here was narrow—when Congress "delegates discretionary authority to an agency," the judicial role is limited to "ensuring the agency has engaged in 'reasoned decisionmaking' within th[e] boundaries" of the delegated authority. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024)

(simplified). And as the Supreme Court has repeatedly reminded us, "we have neither the ability nor the authority to assess and countermand [the Executive's policy] choice[s]." *Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2088 n.5 (2026).

In 2022, the Biden Administration enacted the Circumvention of Lawful Pathways ("CLP") Rule to deal with the mounting crisis on the southwestern border. 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 C.F.R. § 208.33 and § 1208.33). Illegal entry into the country from Mexico was at "all-time high," overwhelming the government's ability to effectively manage and stem the illegal migration. *See id.* at 31314–16 (May 16, 2023). Instead of being able to quickly remove illegal aliens from the country, the government faced thousands of aliens seeking asylum—hammering immigration courts with mostly non-meritorious asylum applications. *Id.* at 31315. The result: "those with meritorious claims [had] to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal." *Id.*

The CLP Rule tried to alleviate some of that pressure by encouraging illegal aliens to use orderly "pathways" into the United States or to seek asylum in other countries. *See* 88 Fed. Reg. at 31314, 31317. The CLP Rule established a "rebuttable presumption of ineligibility for asylum" for all aliens "who ente[red] the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission." 8 C.F.R. § 1208.33(a)(1). It was of limited duration—only for two years. *Id.* § 1208.33(a)(1)(i). And it didn't apply to Mexican nationals. *Id.* The Rule also had numerous exceptions—it didn't apply to unaccompanied children, aliens with

authorization to travel to the United States to seek parole, those with pre-scheduled appointments with the Department of Homeland Security, or aliens denied asylum in another country. *Id.* § 1208.33(a)(2). The presumption could be rebutted by showing an "exceptionally compelling circumstance[,]" such as an acute medical emergency, an imminent and extreme threat to life or safety, or being a victim of human trafficking. *Id.* § 1208.33(a)(3). The government justified the CLP Rule under its authority to establish *any* "limitations and conditions" on asylum eligibility "consistent" with the rest of § 1158. 88 Fed. Reg. at 31323 (citing 8 U.S.C. § 1158(b)(2)(C)).

Rather than accept a straightforward reading of law, the majority weaponizes our narrow "consistency" review to invalidate the CLP Rule here. The majority claims that the Rule contradicts a provision that allows aliens to apply for asylum "whether or not" the alien entered the United States "at a designated port of arrival." 8 U.S.C. § 1158(a)(1). But how exactly does the Rule contradict this provision? After all, this provision is solely about asylum *applications* while the Rule is about asylum *eligibility*. To get around this obvious mismatch, the majority judicially creates a substantive "guarantee" for aliens—one that eliminates the government's ability to consider "manner of entry" in adjudicating asylum applications. Maj. Op. 23. Of course, that is beyond our role. And even more, the CLP Rule doesn't even turn on an alien's "manner of entry," as the majority believes. Instead, it applies across the board to all aliens except for those denied asylum elsewhere or those with authorizing paperwork or a pre-scheduled appointment. Most concerning, the majority reads the provisions of § 1158 so broadly that it all but forecloses the Executive from promulgating *any* new conditions on asylum eligibility.

In the end, the majority's disagreement with the Rule is about one thing: immigration policy. We can be sympathetic to the plight of Lester Garcia Morales and his family. We can be sympathetic to the countless other aliens seeking a better life in the United States. But our sympathy is no substitute for following the law. Indeed, "[t]he wisdom of the policy" of encouraging illegal aliens to use lawful pathways "is not before us." *Mullin*, 146 S. Ct. at 2096. Our only role is to decide whether the CLP Rule is "consistent" with asylum law. 8 U.S.C. § 1158(a)(1). On that score, the answer is easily "yes."

Because we usurp immigration policy from the political branches in granting this petition, I respectfully dissent.

**I.**

This case is the latest chapter in a "sad, protracted saga" that's been playing out in our circuit for the better part of a decade. *E. Bay Sanctuary Covenant v. Trump*, 134 F.4th 545, 548 (9th Cir, 2025) (VanDyke, J., concurring in the judgment). So I start from the beginning.

**A.**

*The Entry Rule*

In 2018, the Trump Administration adopted the so-called "Entry Rule," an automatic bar on asylum eligibility for aliens who came into the United States against the terms of a "presidential proclamation or other presidential order." Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55952 (Nov. 9, 2018). That same day, President Trump issued a proclamation, declaring ineligible for asylum any aliens who crossed into the United States from Mexico outside of a port of entry during the ensuing 90 days.

Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57661, 57663 (Nov. 9, 2018).

The Entry Rule was a reaction to the "increase in the number and proportion of inadmissible aliens" entering the country without valid asylum claims. 83 Fed. Reg. at 55935. When the rule was promulgated, U.S. officials on the southern border were encountering approximately 2,000 inadmissible aliens every day. *Id.* And the immigration climate incentivized "large caravans of thousands of aliens" to enter unlawfully between designated ports of entry, endangering themselves and the officials safekeeping the border. *Id.* at 55935.

Before the Entry Rule went into effect, East Bay Sanctuary Covenant, a non-profit organization that assists aliens in removal proceedings, challenged the rule and a district court preliminarily enjoined it. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 659 (9th Cir. 2021) ("*East Bay I*"). And we upheld the preliminary injunction, deeming the Entry Rule "inconsistent" with asylum law and arbitrary and capricious. *Id.* at 660.

*The Transit Rule*

In 2019, the Trump Administration adopted the so-called "Transit Rule." Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019). It made aliens who entered the United States across the southern land border categorically ineligible for asylum if they transited through another country on their way here. *Id.* at 33835. The Rule included three exceptions: (1) if the alien had applied for (and been denied) asylum in another country, (2) if the alien was a victim of a "severe form of trafficking," or (3) if the country through which the alien had traveled would not

have granted asylum under the relevant United Nations conventions. *Id.*

The Transit Rule's purpose mirrored that of the Entry Rule. From 2013 to 2018, the number of pending immigration cases had more than doubled, and in just the first half of 2019, another 100,000 cases had been added—a 13% jump from the beginning of that year. *Id.* at 33831. This created an overwhelming backlog of immigration cases, which encouraged aliens to enter and remain in the country illegally. *Id.* The Trump Administration passed the rule to discourage individuals from abusing this delay to stay in the United States, even though they were ineligible for asylum. *Id.*.

The Rule was also passed to discourage a growing concern: forum shopping. Because the "core regulatory purpose" of asylum law is to protect those "with nowhere else to turn," *id.* at 33834 (citing *Matter of B-R-*, 26 I&N Dec. 119, 122 (BIA 2013)), the Transit Rule sought to discourage aliens from claiming asylum in the United States when they could have sought protection elsewhere, *see id.* at 33830. Part of the purpose was to deny asylum to "those persons effectively choosing among several countries where avenues to protection" are available but that chose to wait until reaching the United States. *Id.* at 33834. After all, when aliens entering the United States could have sought protection elsewhere but did not, "it is reasonable to question whether the aliens genuinely fear persecution or torture, or are simply economic migrants[.]" *Id.* at 33839.

Once again, East Bay Sanctuary Covenant challenged this rule and, once again, the district court immediately enjoined it. *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 969 (9th Cir. 2020) ("*East Bay II*"). We again

contended that the rule was "not consistent" with the asylum statute and arbitrary and capricious. *Id.* at 988 (simplified).

*The Circumvention of Lawful Pathways Rule*

In 2022, the immigration crisis on the southern border reached a boiling point. Crossings at the southern border outside of a port of entry reached an all-time high—averaging 8,000 aliens per day for eleven months that year. 88 Fed. Reg. at 31315. That was four times the daily average of the past twenty years. *Id.* Further, the Biden Administration also feared that the end of the COVID-19-related "Title 42 public health Order" mandating the removal of some aliens would compound the unprecedented recent growth in migration at the southern border. *Id.* at 31316.

The Biden Administration sought to stem the exigency of significant crossings of illegal immigrants into the country. It enacted the "Circumvention of Lawful Pathways Rule," which was effective for only a limited time—from May 11, 2023, to May 11, 2025. *Id.* at 31314, 31319. The Rule, according to the Administration, "ensure[d] lawful, safe, and orderly processing" in response to the "increase in the number of migrants" seeking to enter the country. *Id.* at 31332. It "incentivize[d] migrants to use lawful, safe, and orderly means" if they wanted "to enter the United States to seek asylum[.]" *Id.* at 31316. The Rule creates a "rebuttable presumption of ineligibility of asylum" for aliens who entered the United States through the southwest border "without documents sufficient for lawful admission" after traveling through a country that is a party to one of the United Nations' Conventions relating to refugees and was not the alien's country of citizenship or nationality. 8 C.F.R. § 1208.33(a)(1), (a)(1)(iii). Because an alien must travel through another country for the presumption to apply, it

doesn't affect Mexican nationals, who presumably enter the United States directly from Mexico. *See id.* The presumption also doesn't apply to:

1. Unaccompanied children;
2. Those granted parole to enter the U.S.;
3. Those who presented at a port of entry using the Department of Homeland Security's scheduling system ("CBP One") or who showed they couldn't access or use the system;
4. Those who sought asylum in a country they traveled through and were denied asylum.

§ 1208.33(a)(2)(i–ii). On January 20, 2025, President Trump terminated CBP One—the system that allowed aliens to schedule a time to appear at a designated port of entry—and the parole exception. *See* Securing Our Borders, 90 Fed. Reg. 8467, 8468 ¶ 7(a)–(b) (Jan. 20, 2025).

Aliens can also rebut the presumption by showing that "exceptionally compelling circumstances exist." *Id.* § 1208.33(a)(3). The presumption is "necessarily rebut[ted]" if at the time of entry, the alien or a member of the alien's family (1) "[f]aced an acute medical emergency," (2) "[f]aced imminent and extreme threat to life or safety," or (3) was a "victim of a severe form of [human] trafficking." *Id.* § 1208.33(a)(3)(i)(A–C) (citing 8 C.F.R. § 214.201). "The presumption [is also] rebutted" if it would cause an applicant and his family to be separated or treated differently based on the presumption. *See* id. § 1208.33(c).

As is no surprise, East Bay Sanctuary Covenant again sought an injunction of the asylum-limiting rule. It then

secured a third injunction before the district court. *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *opinion modified on reconsideration sub nom. E. Bay Sanctuary Covenant v. Trump*, 2026 WL 1256873 (N.D. Cal. May 7, 2026). The district court explained that the CLP Rule conflicts with asylum law and is arbitrary and capricious. *Id.* at 1041, 1043–53.

This is where things get interesting. Something different happens on appeal to the Ninth Circuit. Although the Ninth Circuit had twice denied stays of injunctions of asylum-limiting rules during the Trump Administration, we took a different approach to these rules under the Biden Administration. Without explanation, a motions panel majority granted the Biden Administration's request for a stay—letting the CLP Rule go into effect. The panel majority did not explain what had changed between the Trump Administration's issuance of two enjoined rules and the Biden Administration's issuance of the CLP Rule. Dissenting, Judge VanDyke called out the inexplicable change of heart by the panel majority. *E. Bay Sanctuary Covenant v. Biden*, 2023 WL 11662094, at *2 (9th Cir. Aug. 3, 2023) (VanDyke, J., dissenting from the grant of a stay pending appeal). We are left only to speculate on the panel majority's 180-degree turn.

After oral argument on the merits, East Bay Sanctuary Covenant and the Biden Administration asked the panel to hold the case in abeyance for settlement talks. Once again, a divided panel of our court granted the motion and vacated submission without reasoning. *E. Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130, 1131 (9th Cir. 2024). A year later, those settlement talks failed. The panel remanded the case for the district court to consider the change in circumstances over the past year. *E. Bay Sanctuary Covenant*, 134 F.4th at

545 (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)). And the government had terminated some of the regulations on which the rule's exceptions relied. *Id.* Judge VanDyke concurred but lamented the "controversial and flawed circuit precedent" this line of cases had generated. *Id.* at 548 (VanDyke, J., concurring). He explained that "[s]o much time [had] passed in this legal twilight zone that" it forced the panel to remand—"the latest play in this [circuit's] ongoing game of Supreme Court keep-away." *Id.* at 550.

After oral argument here, the district court "reaffirmed" its order vacating the CLP Rule "as contrary to the asylum statute, 8 U.S.C. § 1158, arbitrary and capricious, and procedurally defective." *E. Bay Sanctuary Covenant*, 2026 WL 1256873, *1–2 (N.D. Cal. May 7, 2026). The district court then vacated the CLP Rule.

**B.**

Lester Garcia Morales and his family, all natives and citizens of Guatemala, now challenge the CLP Rule. In October 2022, Garcia Morales and his family left Guatemala for the United States. Even though they traveled through Mexico on their way here, Garcia Morales didn't seek asylum in Mexico. In October 2023, they illegally entered the United States outside a port of entry, by crossing the Rio Grande near Eagle Pass, Texas. The Department of Homeland Security found and tried to remove the family. Garcia Morales and his family then filed asylum applications.

The Immigration Judge ("IJ") denied Garcia Morales and his family's applications for asylum because he was presumptively ineligible based on the CLP Rule and didn't rebut the presumption. The IJ also found that, regardless of

the CLP rule, Garcia Morales failed to establish eligibility for asylum, withholding of removal, or protection under the Convention Against Torture. The family appealed to the Board of Immigration Appeals ("BIA").

The BIA dismissed the appeal and entered a final order of removal. The BIA affirmed that Garcia Morales was ineligible for asylum under the CLP Rule, and that alternatively, he hadn't established entitlement to asylum, withholding of removal, or CAT protection.

**II.**

The issue here is whether the BIA could lawfully conclude Garcia Morales and his family were ineligible for asylum based on the CLP Rule. This all turns on whether the Rule was "consistent" with asylum law. 8 U.S.C. § 1158(b)(2)(C). The answer to that is "yes." We should have denied this petition for review.

**A.**

"Statutory interpretation focuses on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 354 (2011) (Thomas, J. concurring) (simplified). Section 1158 provides that "[t]he Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). Based on its text, context, and structure, this provision expressly grants the Executive broad discretion to condition asylum eligibility through regulation. The only caveat is that the conditions must be "consistent" with the rest of § 1158. Nothing in the CLP Rule is inconsistent with § 1158.

***Text***

Start with the text. *Hall v. EPA*, 273 F.3d 1146, 1156 (9th Cir. 2001). What does it mean to be "consistent?" As a matter of ordinary English, "consistent" means that any limitation or condition must be "compatible," "in agreement with," or "coherent and uniform" with the rest of the section. *See* The American Heritage College Dictionary 297 (3d ed. 1993); Black's Law Dictionary (6th ed. 1990) ("Having agreement with itself or something else; accordant; harmonious; congruous; compatible; compliable; not contradictory."); Webster's Third New Int'l Dictionary 484 (1993) ("coexist[s] and show[s] no noteworthy opposing, conflicting, inharmonious, or contradictory qualities"). So, under § 1158(b)(2)(C), the Attorney General has broad discretion to establish any limitations on asylum eligibility so long as the limits don't contradict the rest of § 1158.

***Context***

Next consider § 1158(b)(2)(C)'s "statutory context." *See Mullin*, 146 S. Ct. at 2086 ("The context in which [a] phrase . . . is used [may] support[] an ordinary-meaning reading."). That context establishes that asylum has always been a matter of Executive discretion, not entitlement. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987) ("[T]here is no entitlement to asylum, it is only granted to eligible refugees pursuant to the Attorney General's discretion."). Unlike withholding of removal or CAT relief, asylum is a discretionary, "greater form of relief." *Id.*; *see also Alcarez-Rodriguez v. Garland*, 89 F.4th 754, 761 (9th Cir. 2023). So while some aliens may be refugees and thus *eligible* for asylum, it has always been a "matter of discretion" whether an alien *receives* asylum. *See Kazlauskas v. INS*, 46 F.3d 902, 905 (9th Cir. 1995). After

all, grants of asylum, like other "discretionary decisions" in immigration law, "involve policy choices that bear on this Nation's international relations." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

Statutory history reaffirms this broad Executive discretion to establish conditions for asylum eligibility. The INA, as enacted in 1952, contained no provisions for asylum or refugee status. Andorra Bruno, Cong. Rsch. Serv., R48802, *Development of the U.S. Asylum System: In Brief* (2026).[1] In 1965, Congress amended the INA to provide for some "conditional entry of aliens because of persecution or fear of persecution on account of race, religion, or political opinion." Act of Oct. 3, 1965, Pub. L. No. 89-236, § 3, 79 Stat. 913. But Congress made this conditional entry subject to "such regulations as [the Attorney General] may prescribe." *Id.*

When formal asylum was established in 1980, Congress again left the ultimate decision on who should be granted asylum to the Executive. *See* Refugee Act of 1980, Pub. L. No. 96–212, § 201(b), 94 Stat. 105. The Refugee Act succinctly provided that "[t]he Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee[.]" *Id.* In the wake of the Act, the Executive created six categorical bars for asylum. 8 C.F.R. § 208.13(c)(2)(i)(A)–(F) (preserving the original regulatory eligibility for any applicant who filed before April 1, 1997). The regulations automatically denied asylum to those who:

[1] https://perma.cc/RTN9-8X8A.

(1) were convicted of a particularly serious crime, (2) had firmly resettled before traveling to the U.S., (3) were dangerous to the security of the country, (4) had been convicted of an aggravated felony, (5) had participated in the persecution of other people on account of a protected group, or (6) had participated in, or were likely to engage in, terrorist activity. *Id.*

Congress significantly revised asylum procedures with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009–546. In it, Congress restricted asylum and empowered the Executive in three ways. First, it codified the six conditions promulgated by the Executive after the Refugee Act. *See* 8 U.S.C. § 1158(b)(2)(A)(i)–(vi). Second, it expressly authorized the Executive to "establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). And third, the statute significantly changed the asylum process itself, allowing the Attorney General to establish asylum procedures, authorizing asylum application fees, restricting employment authorization for pending asylees, and mandating that adjudication of applications be completed within 180 days. 8 U.S.C. § 1158(d). So Congress followed the Executive's actions, codified the existing regulatory disqualifications, and reaffirmed the Executive's authority to *further* limit eligibility for asylum.

Thus, we must read § 1158(b)(2)(C) considering this history of broad Executive authority to dictate who is entitled to asylum.

***Structure***

Finally, § 1158's structure confirms the Executive's discretionary authority to set asylum conditions. *See U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Statutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." (simplified)). In § 1158, Congress separated the requirements and procedures for *applying* for asylum from those for *granting* asylum—placing them separately in subsection (a) and subsection (b):

- **Section 1158(a)** – "**Authority to apply for asylum**": "Any alien" who is physically present or arrives in the United States may apply for asylum "whether or not [the alien arrives] at a designated port of arrival[.]" 8 U.S.C. § 1158(a)(1).
- **Section 1158(b)** – "**Conditions for granting asylum**": The Executive may grant an alien asylum if it determines the alien meets the definition of a "refugee" and authorizes the Attorney General to "establish" by regulation "additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum[.]" *Id.* § 1158(b)(1)(A), (2)(C).

So the statute's structure delineates between applying for and granting asylum. *East Bay I.*, 993 F.3d at 694 (Bumatay, J., dissenting from the denial of reh'g en banc). In subsection (a), Congress tells us who can apply for asylum:

with some exceptions, "any alien" has authority to do so, regardless of the alien's manner of entry into the country. 8 U.S.C. § 1158(a)(1)–(2). In subsection (b), Congress tells us who may receive asylum: on that front, the Attorney General has broad authority to set the conditions on who is ineligible for asylum. *Id.* § 1158(b)(2)(C). So Congress allows "any alien" to apply for asylum with little limitation, but it also dictated that the Executive have extensive authority to regulate who receives asylum—with the sole limitation that any rules on ineligibility be "consistent with" the rest of § 1158.

As Congress understood, applying for asylum and eligibility for asylum are different concepts. To "apply" is to "make an appeal or a request," especially "for something of benefit to oneself," Webster's Third New Int'l Dictionary at 105, while to be "eligible" is to be "fitted or qualified to be chosen" or "worthy to be chosen or selected," *id.* at 736. *See also* The American Heritage College Dictionary at 66 (defining "apply" as "[t]o request or seek"); *id.* at 694 (defining "ineligible" as "Disqualified by law, rule, or provision" and "Unworthy of being chosen; unfit."). These are thus two separate aspects of asylum that Congress chose to divide—generally allowing all aliens to apply but giving the Attorney General broad discretion to deny. So limiting one doesn't affect the other. Placing a condition on eligibility for asylum doesn't impact who may apply.

* * *

Given the text, context, and structure of § 1158(b)(2)(C), the CLP Rule is perfectly consistent with § 1158. Nothing in the Rule conflicts with the text of § 1158. The Rule doesn't interfere with aliens' ability to apply for asylum; it only restricts the parameters of a *successful* asylum

application in limited ways. And it is "consistent" to allow aliens to apply for asylum *generally* and to restrict asylum eligibility to only a subset of those who apply. Section 1158's bifurcation of authorities means that the Executive can't unilaterally decide who applies for asylum but can alter who receives asylum. The CLP Rule thus falls squarely within the Executive's condition-making authority under § 1158(b).

And the CLP Rule is consistent with our precedent because it doesn't turn on "manner of entry." The Rule was of limited time and scope and provided multiple ways for aliens to rebut the presumption of ineligibility. It provided a narrow presumption of ineligibility for asylum for those who circumvent lawful pathways—affecting only a small sliver of all aliens who may apply. It was limited geographically and temporally, applied only to non-Mexican nationals, and may be rebutted several ways. 8 C.F.R. § 1208.33(a)(1)–(2). The presumption only applied to aliens entering the United States without documents, in the southwest border, for two years, who passed through a country where they could have received asylum. *Id.* § 1208.33(a)(1)(i). And it didn't apply to unaccompanied children, aliens with travel authorization to seek parole in the United States, or aliens who were denied asylum in a country through which they traveled. *Id.* § 1208.33(a)(2). An alien could then rebut the presumption by showing "exceptionally compelling circumstances," including that he or a family member "[f]aced an acute medical emergency," "[f]aced an imminent and extreme threat to life or safety," or was a "victim of a severe form of trafficking in persons." *Id.* § 1208.33(a)(3)(i) (simplified). So the Rule is hardly a categorical bar on eligibility based on manner of entry. It is simply an exercise of the Executive's discretionary authority.

**B.**

**1.**

The majority quibbles with this analysis by cosplaying as textualist. But window-dressing with citations by Justice Scalia, Justice Barrett, and *Loper Bright* doesn't mean that the majority understands our limited role in interpreting the law. The CLP Rule is consistent with § 1158 precisely *because* "we use the tools of statutory interpretation to make sense of the text and give it the meaning that it would convey to a reasonable person." Maj. Op. 27 (simplified) (citing A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 235 (2012)). As explained above, based on text, structure, and statutory context, § 1158 distinguishes between applications and eligibility. In short, "the ordinary tools of statutory interpretation," *Biden v. Nebraska*, 600 U.S. 477, 506 (2023), dictate that § 1158 means what it says—authority to apply for asylum and eligibility to receive asylum are conceptually distinct. So the majority launches yet another "pirate ship," purporting to "sail[] under a textualist flag." *Bostock v. Clayton County*, 590 U.S. 644, 685 (Alito, J. dissenting). No one is fooled.

The majority creates a supposed conflict with § 1158(a)(1) by misreading and adding words to the law. The majority asserts that the CLP Rule "directly conflicts" with § 1158(a)'s text providing that any alien who arrives in the United States, "whether or not at a designated port of arrival," may apply for asylum. Maj. Op. 27–28. According to the majority, this subsection grants aliens a "guarantee" that the "government cannot restrict asylum based on [the alien's] manner of entry." *Id.* at 23. Thus, the majority surmises that "the statute does not permit the government to condition asylum eligibility on manner of entry." *Id.* at 27–

28. The majority goes so far as to say that "restricting asylum for *any* subset of noncitizens on account of how they entered the U.S. is impermissible." *Id.* at 28.

But that's wrong for several reasons.

First, the majority misreads § 1158(a)(1). Contrary to the majority's contention, the statute doesn't bar the government from considering the alien's "manner of entry" in adjudicating asylum applications. *See* Maj. Op. 27–28. As a matter of text, § 1158(a)(1) is only about *applications*—it says nothing about an alien's *eligibility* for asylum. Section 1158(a)(1) merely provides that,

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum[.]

8 U.S.C. § 1158(a)(1). The majority interprets this provision as creating a substantive "guarantee"—one precluding the Executive from considering an alien's "manner of entry" in deciding the *merits* of asylum applications. Maj. Op. 23. But that's wrong. Section 1158(a)(1) is a procedural rule—the government complies with § 1158(a)(1) as soon as it accepts and processes an alien's asylum application "irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). Section 1158(a)(1) requires no more.

If Congress wanted to bar the government from considering an alien's "manner of entry" in granting asylum,

it could have easily said so. It didn't, and the majority doesn't get to fill in statutes with its own policy preferences. Indeed, if Congress wanted to make such a rule, it would be odd to place it in § 1158(a), which is about "[a]uthority to apply for asylum." Instead, Congress placed consideration of asylum merits in § 1158(b), which establishes the "[c]onditions for granting asylum." And as a matter of precedent, the majority is simply wrong that the government cannot restrict asylum based on an alien's manner of entry. "The [BIA] and this court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief." *East Bay I*, 993 F.3d at 671. To the extent the majority appears to be overruling those precedents, it cannot do that. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Second, the majority simply misunderstands the CLP Rule. It doesn't categorically bar asylum for aliens merely "because they entered between ports," as the majority claims. Maj. Op. 28. Instead, the CLP Rule's presumption of ineligibility applies to *all* aliens—however they entered the United States—if the alien arrives "without documents sufficient for lawful admission," and if the aliens "traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. § 1208.33(a)(1). Under the Rule, whether an alien enters illegally through rather than between the ports of entry is irrelevant—the presumption of ineligibility applies equally to both categories of aliens if they have no authorizing paperwork or prescheduled appointment. *Id.* So under the CLP Rule, no asylum decision is based on manner of entry alone. Thus, the majority's protestations are based on a rule that is not

before us. We can't simply cut and paste our analysis from past precedents that have no bearing on this case.

Third, even taking the majority on its own mistaken terms, the CLP Rule doesn't interfere with aliens' ability to apply for asylum whatsoever. Aliens, regardless of whether they entered the country at "a designated port of arrival," can still apply for asylum. Nothing in the Rule prevents government officials from accepting and processing asylum applications of any alien—the only requirement of § 1158(a)(1). Instead, the Rule only affects the discretionary decision to grant or deny asylum based on whether they entered illegally and traveled through a country with asylum procedures. And, as stated earlier, it is perfectly "consistent" to allow all aliens to apply for asylum while denying asylum based on set criteria. So the CLP Rule doesn't contradict § 1158(a)(1)'s text at all.

Fourth, again accepting the majority's mistaken understanding of § 1158(a)(1) and the CLP Rule, the CLP Rule is so limited and contains so many exceptions that it cannot be said to categorically bar asylum for aliens because they entered the U.S. between ports of entry, as the majority contends. *See* Maj. Op. 23, 28. To reiterate, the CLP Rule applies across the board, regardless of the alien's manner of entry. But even if we could somehow read the CLP Rule as based on manner of entry, its limitations and exceptions show that it doesn't deny asylum merely for "enter[ing] between ports." *See id.*at 28. Put differently, aliens arriving between ports of entry may still receive asylum several ways, refuting the claim that manner of entry is dispositive of asylum.

Take an alien who illegally enters the United States outside of a port of entry on the northern border or along the

southeast border. The CLP Rule has no effect on him. 8 C.F.R. § 1208.33(a)(1). Or say an alien illegally enters the United States between ports of entry for the first time on the southwest border on May 12, 2025. The Rule has no bearing on her. *Id.* § 1208.33(a)(1)(i). Or if the alien is a Mexican national entering outside a port—almost half of those who cross through the southern border—the Rule has no impact on him. *Id.* § 1208.33(a)(1)(iii); *see also* Andres Ayala & Jeanne Batalova, *Mexican Immigrants in the United States*, Migration Policy Institute (July 16, 2026).[2]

An alien can also enter outside of a port of entry and avoid the presumption if the alien (1) is "an unaccompanied alien child," (2) was provided travel authorization to seek parole, or (3) was denied asylum in another country through which he traveled. *Id.* § 1208.33(a)(2)(i)–(ii). That's not all. Even if none of the above circumstances applied, the alien could still receive asylum by showing a catchall "exceptionally compelling circumstance[.]" *Id.* § 1208.33(a)(3)(i). This exception was meant to "ensure that migrants who are particularly vulnerable, who are in imminent danger, or could not access the lawful pathways provided" could still be eligible for asylum. 88 Fed. Reg. at 31325. The presumption is also "necessarily rebut[ted]" if an alien who entered between ports of entry (or his family member) faced "an acute medical emergency," "an imminent and extreme threat to life or safety," or a "severe form" of human trafficking. 8 C.F.R. § 1208.33(a)(3)(i)–(ii).

Given all these limitations and exceptions, the CLP Rule doesn't categorically deny asylum based on "manner of entry." Simply, the CLP Rule encourages aliens to enter the United States through an orderly process—by prescheduled

---

[2] https://perma.cc/MYJ8-PA24.

appointment, with authorizing paperwork, or after applying for asylum in a third country—while giving the Executive broad discretion to consider a range of circumstances to rebut any presumption of ineligibility. And the majority can't just brush all this away by calling the exceptions and limits too "narrow." Maj. Op. 28.

Fifth, the majority misapplies the absurdity canon to invalidate the CLP Rule. The majority labels the CLP Rule an "absurdity" because, it claims, the Rule permits aliens to apply for asylum who have no eligibility for asylum, making their applications "futile." Maj. Op. 23–24. But we can't just call a law "absurd" because we disagree with the political branches' policy choices. Invoking the absurdity canon requires an "extremely high bar." *United States v. Torres*, 995 F.3d 695, 705 (9th Cir. 2021). As Justice Story said, the "absurdity" must be "so monstrous, that all mankind would, without hesitation, unite in rejecting" the plain meaning of the law. 1 Joseph Story, Commentaries on the Constitution of the United States § 427, at 411 (Fred B. Rothman & Co. 1991). Failing to meet this high threshold would permit judges to invalidate laws they disagree with by simple name-calling. *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 179 n.332 (2010) (warning that the "absurdity doctrine . . . permits outright alterations to the text of a statute."). A law isn't "absurd" just because we don't like it. As the Supreme Court has observed, "we inevitably swerve out of our lane when we put policy considerations in the driver's seat." *Patel v. Garland*, 596 U.S. 328, 346 (2022).

The majority's application of the absurdity doctrine falls far short of this high bar. Indeed, it was Congress that established the system that allows aliens to submit "futile" applications. In § 1158(b), Congress set six statutory bars

on asylum eligibility—prohibiting any of those barred aliens from receiving asylum, even though those aliens are still free to apply for asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(i)–(vi). So aliens who are automatically ineligible under the law may nevertheless file "futile" asylum applications. Consider an alien who "firmly resettled in another country prior to arriving in the United States." *Id.* § 1158(b)(2)(A)(vi). He is categorically ineligible for asylum even though the alien must be allowed to apply for asylum. *Id.* § 1158(a)(1). Similarly, nothing is "absurd" with the CLP Rule establishing a presumption of ineligibility for aliens who circumvent lawful pathways to asylum without preventing those same aliens from applying for asylum. Thus, Congress itself enables the "absurd" outcome the majority decries. And even if the Executive must accept asylum applications regardless of "manner of entry," nothing is "absurd" with Congress allowing the Executive to consider "manner of entry" in denying asylum, especially when conditions on the ground warrant it.

The majority's analysis shows the dangers of abusing the absurdity doctrine. After all, "the absurdity doctrine invites the court to make adjustments" to statutory text—an invitation the majority all too willingly accepts today. *See* Barrett, 90 B.U. L. Rev. at 168. To the extent the absurdity doctrine applies, it reminds us that "we should not myopically focus on a single term or phrase and instead we should evaluate the statute in context." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 756 (9th Cir. 2025) (Bumatay, J., dissenting) (simplified) (considering the doctrine in refuting the majority's absurd interpretation of a statute as forcing States to let illegal aliens vote in American elections). As explained above, evaluating text in context compels the conclusion that the CLP Rule is consistent with § 1158.

Sixth, the majority also mistakenly believes that the CLP Rule contradicts the so-called "broader asylum scheme." Maj. Op. 38. To get there, the majority constructs what it calls asylum's "two-step process," *id.* (simplified), where (1) the applicant establishes his eligibility for asylum, and (2) the Executive may exercise its discretion in the individual case, *id.* According to the majority, because Congress set some threshold eligibility criteria, that forecloses the Executive from "prescrib[ing any] criteria for asylum eligibility." *Id.* at 35 (simplified). The majority thus precludes the Executive from adding *any* condition above the "broad threshold eligibility for asylum." *Id.* at 38. Instead, the majority limits any Executive discretion to the second step, where "the government may [only] consider [other factors] as part of its individualized, discretionary decision to grant asylum in a given case." *Id.* at 39. But this reading conflicts with the plain text of § 1158. The statute expressly states that "the Attorney General may *by regulation* establish additional limitations and conditions" on asylum eligibility. 8 U.S.C. § 1158(b)(2)(C) (emphasis added). Thus, Congress didn't limit the Executive's discretion to individual cases—but permitted the Executive to adopt broad rules that applied across all asylum cases. *See* Black's Law Dictionary (6th ed. 1990) (defining "regulation" as "a rule or order prescribed for management or government"; "Regulation is rule or order having force of law issued by executive authority of government (*e.g.* by federal administrative agency)"). After all, even in areas that require "some level of individualized determination," *Reno v. Flores*, 507 U.S. 292, 313 (1993) (simplified), the Executive can still use "reasonable presumptions and generic rules," *id.* Congress's broad delegation in § 1158(b)(2)(C) "mean[t] that [it was] prepared to accept

administrative dilution" of who may receive asylum. *R-S-C v. Sessions*, 869 F.3d 1176, 1187 (10th Cir. 2017). That Congress set some criteria for asylum eligibility "did not implicitly foreclose the Executive from imposing tighter restrictions" on some aliens. *Trump v. Hawaii*, 585 U.S. 667, 690 (2018).

Finally, while insisting that it will not read "§ 1158(a) out of the U.S. code," Maj. Op. 28, the majority effectively writes § 1158(b)(2)(C) out of the Code. In essence, the majority asserts that the Executive cannot bar asylum for "*any* subset of noncitizens" if eligibility is based on manner of entry, if it concerns "the safety of asylum seekers," or if it conflicts with "threshold eligibility for asylum." *See id.* at 28, 31–32, 38 (simplified). But, as the Tenth Circuit has recognized, saying that the Executive cannot "carv[e] out a subset of aliens" who are ineligible for asylum as "*not* consistent with" § 1158(a)(1) "would mean that the Attorney General could not impose *any* limitations on asylum eligibility because any regulation that 'limits' eligibility *necessarily* undermines the statutory guarantee that 'any alien . . . irrespective of such alien's status' may apply for asylum." *R-S-C*, 869 F.3d at 1187 n.9. With the majority's broad reading of what is not "consistent with" § 1158(a), the majority has effectively "render[ed] § 1158(b)(2)(C) meaningless" and "disabl[ed] the Attorney General from adopting further limitations [which] the statute clearly empowers him to" adopt. *Id.* Indeed, it's hard to see what conditions on asylum eligibility the Executive could impose without running afoul of the majority's expansive construction of § 1158(a). While the majority may "tr[y] to convince readers that it is merely enforcing" the statute's text, "that is preposterous." *Bostock*, 590 U.S. at 684 (Alito, J. dissenting).

**2.**

The American Civil Liberties Union, as amicus, fares no better.

The ACLU first recasts the CLP Rule as one requiring aliens to enter through a port with a CBP One appointment. Under this recharacterization, the ACLU argues that the rule is a "more restrictive version" of the Entry Rule invalidated in *East Bay I*. True, one of the ways to avoid the CLP Rule's presumption of asylum ineligibility is for an alien to "[p]resent[] at a port of entry, pursuant to a pre-scheduled time and place, or present[] at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system[.]" 8 C.F.R. § 1208.33(a)(2)(ii)(B). But this reading ignores that the quoted language is an *exception* to the rule—not the rule itself. As stated above, the presumption of ineligibility applies to *all* non-Mexican aliens—no matter how they entered the United States—if the alien arrives "without documents sufficient for lawful admission" and if the aliens "traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. § 1208.33(a)(1). So the Rule isn't based on manner of entry. And even if we were to consider this exception, it turns not on manner of entry but on whether one has a CBP One appointment. Nothing in § 1158 precludes the Executive from adopting a regulation for orderliness, like requiring an alien to obtain an appointment before being eligible for asylum.

The ACLU next argues that the exception for aliens with "appropriate [travel] authorization" through "a DHS-approved parole process" violates § 1158(a)(1). *See* 8 C.F.R. § 1208.33(a)(2)(ii)(A). To begin, notice that this

exception applies to all aliens with travel authorization no matter where they enter the United States—undercutting the ACLU's contradictory view that the CLP Rule is based on manner of entry. The ACLU then claims that this exception violates § 1158(a)(1)'s command to allow aliens "irrespective of . . . status" to apply for asylum. But the ACLU doesn't explain how this exception interferes with any alien's ability to *apply* for asylum. And it can't be right that the Executive is prohibited from adding "limitations or conditions," § 1158(b)(2)(C), based on an alien's broadly conceived "status." That would preclude all executive discretion since anything could be considered part of an alien's "status." Indeed, the ACLU now would have us hold that an alien's lack of "parole" is now a protected status.

Finally, the ACLU contends that the Executive can't impose a rule denying asylum for aliens who passed through a third country "standing alone" because it would violate our precedent in *East Bay II*. ACLU Br. 10. But the CLP Rule is not identical to the Transit Rule and so *East Bay II* doesn't govern (as explained further below). In any case, *East Bay II* held that the Transit Rule was "inconsistent" with § 1158 because it did not ensure a "genuinely safe option in another country[.]" *East Bay II*, 994 F.3d at 979. The ACLU thus claims that any rule imposed by the Executive must "ensure that asylum seekers can find long-term safety and protection in a third country." ACLU Br. 10. But § 1158 has no such requirement. Instead, *East Bay II* read that atextual condition into the statute based on the purported purposes of the safe-third-country and firm-resettlement bars. *Id.* at 977. But we shouldn't be "inject[ing] into [a] statute a purpose not codified within it." *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1034 (9th Cir. 2010). And that claimed policy is not "codified" in any

meaningful way. Whatever the purposes of the safe-third-country and firm-resettlement bars, *see* 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A)(vi), nothing in § 1158 precludes the Executive from imposing a rebuttable presumption for ineligibility for those who travel through a third country with reasonable asylum procedures. While Congress might have definitively excluded aliens who have firmly resettled or traveled through a safe third country from asylum, that doesn't mean the Executive may not deny asylum for other reasons. Indeed, if Congress wanted to limit the Executive's discretion to deny asylum based on the safety of third countries, it could have said so. That Congress set some hard-and-fast rules doesn't preclude the Executive from exercising its statutory authority to set more rules.

**C.**

As shown, the CLP Rule is not inconsistent with a proper reading of § 1158. Nor does our precedent dictate otherwise. True, *East Bay I* and *East Bay II* struck down the Entry Rule and the Transit Rule—two other asylum rules. But the CLP Rule is different enough from those rules that our precedent doesn't require vacating the denial of asylum here.

The expression goes, "if you find yourself in a hole, stop digging." Ninth Circuit precedent in this area is dead wrong. *See East Bay I*, 993 F.3d at 694–96 (Bumatay, J., dissenting from rehearing en banc). Yet we keep on digging. While it's true we are not free to ignore our past rulings just because we think they are "unwise or incorrect," *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1106 (9th Cir. 2016) (Ikuta, J., dissenting) (simplified), we have no obligation to extend bad precedent, *see NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Loc. 229,* 974 F.3d 1106, 1116 (9th Cir. 2020) (Bumatay, J.,

dissenting from the denial of reh'g en banc). So even if we must respect our prior caselaw, we don't need to take an overly broad view of the precedent, allowing it to expand its reach. *See United States v. Rahimi*, 602 U.S. 680, 730 (Kavanaugh, J., concurring) (explaining that the text's plain meaning "may appropriately function as a gravitational pull on [our] interpretation of precedent."). Instead, if there are good-faith distinctions, we should make them and return closer to first principles. In this case, that means adhering to § 1158's plain meaning—not our precedent's purpose-driven interpretation. Several good-faith distinctions exist between our bad precedents and this case, so we are free to return to an ordinary reading of § 1158.

To begin, the CLP Rule doesn't turn solely on manner of entry—so *East Bay I* doesn't govern. *East Bay I* held that the Entry Rule was "not in accordance with law" because it "requires migrants to enter the United States at ports of entry to preserve their eligibility for asylum," which the precedent claimed conflicted with § 1158(a)(1)'s provision allowing aliens to apply for asylum when "physically present in the United States" or after "arriv[ing] in the United States (whether or not at a designated port of arrival . . .)." *East Bay I*, 993 F.3d at 669 (simplified). As stated above, the CLP Rule's presumption of ineligibility doesn't turn on whether an alien entered at a port of entry; instead, the presumption applies across the board if the alien enters "without documents sufficient for lawful admission" and if the aliens "traveled through a country other than the alien's country of citizenship [or] nationality[.]" 8 C.F.R. § 1208.33(a)(1). In other words, the presumption applies regardless of whether the alien entered through the ports of entry or between the ports of entry. Indeed, absent some exception, the presumption still applies if the alien enters at

a port of entry unless the alien has a pre-scheduled appointment with the government. *Id.* § 1208.33(a)(2)(ii)(B). Even if the CLP Rule is construed as a manner-of-entry rule—as the majority mistakenly believes—it contains so many exceptions and limitations that it doesn't resemble the "categorical ban" encountered in *East Bay I*. 993 F.3d at 669. So an alien can still receive asylum after crossing between ports of entry several ways. Simply, the CLP Rule's scope is significantly narrower than the Entry Rule and so *East Bay I* doesn't dictate the result here.

Nor does *East Bay II* control. *East Bay II* dealt with another "categorical[]" rule—the Transit "Rule categorically denie[d] asylum to aliens arriving at our border with Mexico unless they have first applied for, and have been denied, asylum in Mexico or another country through which they have traveled." *East Bay II*, 994 F.3d at 969. *East Bay II* viewed the Transit Rule as inconsistent with § 1158 because it categorically denied asylum to aliens even if they had no "genuinely safe option in another country." *Id.* at 979. The CLP Rule isn't so categorical. Instead, the CLP Rule considers several factors before applying the presumption of ineligibility. Under the Rule, an alien may still receive asylum even if he didn't apply for asylum in a third country if he (1) entered outside the southwest border, (2) entered for the first time after May 11, 2025, (3) was an unaccompanied child, (4) traveled with authorization to seek parole, (5) had a pre-scheduled CBP One appointment, (6) did not have a pre-scheduled appointment but demonstrated it was not possible to use the system due ongoing and serious obstacles, (7) faced an acute medical emergency, (8) faced an imminent and extreme threat to life or safety, (9) was a victim of human trafficking, or (10) showed any other

"exceptionally compelling circumstance[]." 8 C.F.R. § 1208.33. Rather than disregard any concern for an alien's safety, the CLP Rule "ensure[s] that migrants who are particularly vulnerable, who are in imminent danger, or could not access the lawful pathways provided" would still be eligible for asylum. 88 Fed. Reg. at 31325. So instead of the automatic bar to asylum found in *East Bay II*, the CLP Rule took a more holistic approach and required "a case-by-case consideration of facts and factors." 88 Fed. Reg. at 31374.

Indeed, a motions panel of this court already rejected the view that the CLP Rule is squarely governed by our precedent. Recall that the district court vacated the CLP Rule "under binding Ninth Circuit precedent." *E. Bay Sanctuary Covenant*, 683 F. Supp. 3d at 1041. Even so, a motions panel of our court stayed the district court's order, allowing the CLP Rule to go into effect. *East Bay I*, 2023 WL 11662094, at *1. This was over the dissent of Judge VanDyke, who said that granting the stay "ignore[d] our circuit's binding precedent." *Id.* at *2 (VanDyke, J. dissenting). As Judge VanDyke pointed out, the government had to meet the "demanding standard" of a "*strong* showing" of likelihood of success on the merits under our precedent to be granted a stay. *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). Yet the panel majority granted the stay. So at least two judges did not view *East Bay I or II* as directly foreclosing the CLP Rule. Rather than make a bad situation worse, we should have limited the damage and cabined our wayward precedent.

Case: 25-1760, 08/31/2026, DktEntry: 52.1, (83 of 88)



## D.

Because the CLP Rule is consistent with § 1158, the BIA reasonably determined that Garcia Morales failed to rebut the presumption of ineligibility.

Let's briefly recount the facts. In the fall of 2022, Garcia Morales and his family left Guatemala. They traveled through Mexico on their way to the United States, but they did not seek asylum there. Garcia Morales testified that, in November 2022, the smuggler who was taking them across the border ordered them to pay more money or else he would abandon the family there. Garcia Morales testified that he overheard the smuggler's call with a friend in which the smuggler instructed the friend to bring a truck and "take" Garcia Morales and his family because they had not paid. Rather than wait for the apparent kidnapping, the family simply walked away, saw a bus pass by, and got on it. The smuggler didn't attempt to stop the family from getting on the bus. They ultimately entered the United States in October 2023.

Substantial evidence supports the BIA determination that Garcia Morales failed to rebut the presumption of ineligibility under the CLP Rule. Garcia Morales doesn't contest that he didn't apply for asylum in Mexico and that he entered the United States without authorizing paperwork or appointment. So as a threshold matter, the presumption of ineligibility applies to Garcia Morales and his family. And the BIA reasonably concluded that he didn't "[f]ace[] an imminent and extreme threat to life or safety." *See* 8 C.F.R. § 1208.33(a)(3)(i)(B). Garcia Morales suggests his family was threatened with kidnapping, but the record doesn't compel the conclusion that the "threat" they faced was "imminent and extreme." Indeed, the smuggler neither

physically harmed them nor prevented them from walking away and boarding a bus. Thus, the CLP Rule is enough to deny Garcia Morales and his family asylum.

## III.

The majority compounds its errors by creating a new rule that the BIA must use magic words when analyzing mixed-motives cases. Under its new rule, the BIA must spell out every element of every way a petitioner may establish mixed motives before denying a claim. That is wrong, and the BIA's reasonable decision should be affirmed.

In addition to relying on the CLP Rule, the BIA affirmed the IJ's denial of Garcia Morales's asylum claim because he failed to establish a "nexus" to a protected class. The BIA agreed that Garcia Morales's alleged persecutor was "motivated by monetary gain" and not by Garcia Morales's membership in any protected group. Substantial evidence supports that conclusion, and we should have left that decision undisturbed.

Garcia Morales owned a taxi business in Guatemala and would regularly pay the Mara 18 gang so he could run his taxi business in peace. Tension between Mara 18 and Garcia Morales intensified when a man named "Placido," Mara 18's local leader, murdered Garcia Morales's sister in late 2020. Garcia Morales testified that Placido killed her because she refused his demand to pay him 50,000 quetzales. A month after his sister's murder, Garcia Morales began to receive threats from Placido, demanding that he keep paying the monthly extortion payments, or the same thing would happen to him. In 2022, Placido ordered Garcia Morales to pay him 8,000 quetzales monthly. But Garcia Morales negotiated his payments down to 1,000 quetzales per month and paid that amount. The next day, however, Placido

demanded Garcia Morales pay him an added one-time payment of 100,000 quetzales or else he would murder Garcia Morales and his family. In response, Garcia Morales fled.

The BIA reasonably found that all of Placido's threats came back to one thing: money. For example, when discussing the death of his sister, Garcia Morales gave a clear reason: "[b]ecause of not paying the monthly payment[.]" Or when the IJ asked about Placido's motivation, Garcia Morales explained that Placido shook him down for so much because "he thought I had a lot of money." In fact, Placido made his motive explicit when he texted Garcia Morales that "he knew [Garcia Morales] just bought a car and that [he] had a lot of money." And why does Garcia Morales fear harm if he returns to Guatemala? "Because [he] did not pay the money that they asked . . . for."

Garcia Morales argued his case involves mixed motives because Placido targeted him on account of his wealth *and* his particular social group of (1) taxi owners, or (2) Guatemalans not complying with gang demands or extortions. Even so, the BIA followed the evidence to a logical conclusion: that the only "central reason" for Garcia Morales's persecution was money. *See Manzano v. Garland*, 104 F.4th 1202, 1207 (9th Cir. 2024). Indeed, even when a persecutor is motivated in part by a protected ground, it is not enough if that motive was "incidental, tangential, superficial, or subordinate to another reason for harm." *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009) (simplified). And "[w]here the record indicates that the persecutor's actual motivation for threatening a person is to extort money from a third person, the record does not compel finding that the persecutor threatened the target because of a

protected characteristic[.]" *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1019 (9th Cir. 2023).

That should have been the end of it. But the majority demands more. The majority announces a new rule that the BIA must recite all the elements of all the ways a petitioner may establish a mixed-motives case before denying asylum. But that's not the law. For mixed-motives cases, we've only said that there are "at least two ways" to meet the "one central reason" standard. *Manzano*, 104 F.4th at 1207. "First, a motive is a central reason if the persecutor would not have harmed the applicant if such motive did not exist and the motive was more than incidental or tangential." *Id.* (simplified). "Second, a motive is a central reason if that motive, standing alone, would have led the persecutor to harm the applicant." *Id.* (simplified).

The majority claims that the BIA committed legal error because it didn't "apply our complete mixed motives framework." Maj. Op. 45. The majority says that the agency must assess both ways to establish mixed motives in every case. *See id.* at 47–48. But none of our precedent requires this. Instead, our precedent only suggests that these are "at least" two "potential ways to show a sufficient causal nexus." *Manzano*, 104 F.4th at 1207–08. The majority confuses these two "routes" a petitioner can take with a legal standard that the BIA must sua sponte analyze in every case. *See id.* at 1209. The majority then remands for the BIA to conduct this new-found legal test.

But most bafflingly, the BIA did analyze these two "ways." The BIA cited *Manzano* and found that Garcia Morales didn't show either way of establishing a mixed motive. The BIA found that "the respondents have not shown that if Placido's motive for monetary gain and his

belief that they had money did not exist, he still would have targeted them based on any of their proposed particular social groups." That's the first *Manzano* route to show a sufficient mixed motive. And earlier in its opinion, the BIA said that Garcia Morales and his family "have not established that their membership in any of [the claimed protected] groups, standing alone, would have led to Placido to harm them." That's the second *Manzano* route to show a sufficient mixed motive.

In the end, the majority seems upset that the BIA did not recite magic words by announcing all the elements of both *Manzano* routes. But "[t]he crucial point for purposes of review is that the Board apply the correct standard, not that it utter the correct words." *Rebollo-Jovel v. INS*, 794 F.2d 441, 449 (9th Cir. 1986) (Canby, J. concurring in part and dissenting in part). When the BIA "expressly cite[s] and applie[s] the relevant caselaw in rendering its decision," we accept that the BIA applied the correct legal standard absent "any red flags." *Martinez v. Clark*, 124 F.4th 775, 785 (9th Cir. 2024) (simplified). No red flags exist here, and we should have denied the petition in full.

## IV.

Rather than impose our will, we should have deferred to the political branches. The CLP Rule is perfectly consistent with asylum law, and we should've denied this petition. Rather than follow the plain text of the law, which grants the Executive broad discretion to impose "additional conditions and limits" on asylum eligibility, 8 U.S.C. § 1158(b)(2)(C), we all but make that provision a dead letter. As I've said before, "[t]he proper forum" for these "policy disputes is the ballot box, not the courthouse." *East Bay I*, 993 F.3d at 688 (Bumatay, J., dissenting from rehearing en banc). We have

no business "presiding over our nation's immigration policies." *Id.* Now, *for the third time*, "we . . . second-guess the Executive's immigration policies" and decide for ourselves what's best for our country. *Id.* This is not our role.

For these reasons, I respectfully dissent.